THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BILLY STAMPS *et al.*, Defendants-Appellants.

First District (5th Division) Nos. 81—40, 81—41 cons.

Opinion filed July 23, 1982.

Sam Adam and Richard Stopka, both of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and David L. King, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

In a jury trial, defendant Hilmon Stamps (Hilmon) was convicted of illegal possession and delivery of more than 30 grams of cocaine, a controlled substance, and defendant Billy Stamps (Billy) was convicted of illegal possession and delivery of more than 30 grams of a substance containing cocaine and of more than 30 grams of a substance containing heroin.[1] (Ill. Rev. Stat. 1977, ch. 56½, pars. 1401(a)(1), (2), 1402(a)(1), (2).) Merging the convictions for possession into the convictions for delivery, the trial court sentenced Hilmon to 12 years imprisonment and Billy to concurrent terms of 15 years for delivery of cocaine and delivery of heroin.

On appeal, defendants contend that (1) the seizure of the narcotics

---

[1]Indicted with Billy for the same offenses was Ruby Fay Thomas, who was acquitted of all charges.

was improper; (2) Billy was not proved guilty beyond a reasonable doubt; (3) the trial court erred (a) in permitting a bank trust officer to give explanatory and opinion testimony as to a land trust agreement involving Billy, which purported error was compounded by the prosecutors' remarks in closing argument, (b) in barring the defense from cross-examining the arresting police officers as to bias and motive, and (c) in denying them the right to present a defense; (4) the jury (a) was not instructed on Billy's theory of defense, and (b) was improperly instructed that defendants could be convicted of illegal possession if they controlled the "area" where the substances were found; and (6) the trial court abused its discretion by *sua sponte* modifying the instruction defining possession.

Investigator Zito testified that in the early morning hours of November 21, 1977, he and Investigators Mokstead and DeSimone drove to a building located at 4654 West Madison Street after being informed that a large narcotics transaction would take place; that when their squad car was about 100 feet from the building, he observed three people standing at the doorway, and when they were 40 to 60 feet away he saw one of the individuals—identified as Carl Branch—with his arm outstretched holding a plastic bag which he was giving to the others; that when the squad car was 25 to 30 feet away, Branch dropped the container and ran into the building while the other two individuals fled east on the street; that Zito picked up the plastic container of white powder and put it into his pocket, and getting no response to a request to open the door he forced it open with a pry bar and sledgehammer; that he entered the building—a furniture warehouse—and followed an individual to the top of a stairway where he saw Branch and another man—identified by Zito in court as Hilmon—who was carrying a brown leather case with a strap; that Branch went into an office section, and he followed Hilmon into a lavatory where on a wastebasket under the sink he saw the leather case in which he found several plastic containers of white powder similar to the one recovered on the sidewalk; that he turned Hilmon and the case over to Mokstead and, when there was no reply to his demand to open the office door, he forced it open with the sledgehammer; that upon entering, he saw Branch throwing plastic bags of white powder against the wall and Billy crouching down and running to the right to Zito; that when Billy refused his order to stop, Zito threw the sledgehammer and reached for his revolver; that when the lights went on, he observed Billy on the floor holding his head; that he (Zito) had no intention of hitting Billy with the sledgehammer; that there was white powder on Branch's hands and clothing and on the floor immediately in front of him and on the wall; that on a desk in the

room there were two plastic bags containing white powder, a scale, and several weapons; and that on another desk there were a number of plastic bags containing white powder.

Investigator Mokstead testified that at the request of Ruby Fay Thomas he obtained a wet wash cloth for Billy's face and then searched the office and secured the items which were lying on the desks, which included a mixer; that he searched a hole in the ceiling and recovered a brown paper bag containing three plastic bags of brown powder; and that, after Billy made a telephone call, his brother-in-law Paul Jackson arrived and was given a set of keys by Billy.

It was stipulated that the bag of powder recovered on the sidewalk contained 19.74 grams of cocaine; that the bags in the leather case contained 282 grams of cocaine; that the two plastic bags recovered from one of the office desks contained 49.29 grams of cocaine; and that the bags of brown powder recovered from the ceiling contained 45.13 of heroin. There was also testimony that telephone, gas, and electric company records listed Stamps Brothers Furniture at 4654 West Madison Street as a customer; that the telephone and gas service was billed to "Johnny Stamps" and the electricity billed to "W. Stamps doing business as Stamps Brothers Furniture"; and that no one in the Stamps family had a first name beginning with "W" aside from Billy.

Asserting that he was merely present at the warehouse at the time in question, Billy testified that he was a licensed trainer of horses, having sold a trucking business he had previously owned; that he had no interest in the building in question and had never obtained telephone, gas, water, or electrical service for it; that at the time in question (November 21, 1977), he was with Hilmon, Ruby Thomas, and Edna Jackson (his sister) in her bar next door to the warehouse; that Hilmon and Ruby left and went to the warehouse while he remained in the lounge to borrow $150 from Edna, who told him that while she was getting the money he was to wait for her at the warehouse; that since he had no keys, he knocked and Paul Jackson let him in; that Ruby and Hilmon were there along with two men whom he later learned were Carl Branch and George Washington; that he was on the second floor when he heard a door slam and a loud noise, as though someone was trying to break in; that Hilmon left the room, and Branch came in carrying a leather bag from which he pulled "stuff" out and threw it "every which way"; that Zito then entered and ordered him to "get upside the wall"; that when Billy asked what he had done, Zito shouted a profanity and again ordered him against the wall, this time striking him above the right eye with the sledgehammer and rendering him unconscious; that he was first taken to a hospital where he re-

ceived treatment and then to the police station; and that, while Zito had originally intended to charge him with "disorderly," after Billy threatened to sue Zito he was charged with illegal possession.

OPINION

We first consider the legality of the police conduct during the seizure of the narcotics. Defendants contend that the police illegally entered the warehouse and arrested Hilmon Stamps without probable cause and that the warrantless seizure of the leather case and of the items in the office area was illegal. Based on the record before us, however, we conclude that the trial court properly denied defendants' motion to suppress the evidence.

In *Mancusi v. DeForte* (1968), 392 U.S. 364, 367-68, 20 L. Ed. 2d 1154, 1158-59, 88 S. Ct. 2120, 2123-24, it was stated:

> "This Court has held that the word 'houses,' as it appears in the [Fourth] Amendment, is not to be taken literally, and that the protection of the Amendment may extend to commercial premises. *** [C]apacity to claim the protection of the Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion."

With respect to the warrantless searches of commercial or business premises, the court further stated that except in certain carefully defined classes of cases, a nonconsensual search of private property can only be made on the authority of a search warrant. (392 U.S. 364, 370, 20 L. Ed. 2d 1154, 1161, 88 S. Ct. 2120, 2125.) Consistent with *Mancusi*, the courts of this State have recognized that the protection of the fourth amendment may extend to places other than private residences. In *People v. Davis* (1980), 86 Ill. App. 3d 557, 407 N.E.2d 1109, it was held that the police acted illegally in entering the premises of a grinding company without a warrant. The court found that those premises did not permit general public access and that the arrest of defendant, who was a part-time employee, was without probable and sufficient exigent circumstances. Similarly, in *People v. Clark Memorial Home* (1969), 114 Ill. App. 2d 249, 252 N.E.2d 546, the court required suppression of evidence seized in a nonconsensual and nonexigent entry of law enforcement officials into an American Legion Post occupied by a veterans' organization open only to members and guests and found not to be public in nature. By contrast, in *People v. Boyle* (1977), 51 Ill. App. 3d 320, 366 N.E.2d 600, police entry upon Chicago Transit Authority premises, over which accused had no legal control, did not require suppression of evidence seized without a warrant. The accused

allegedly conducted gambling operations in a CTA building in potential view of employees and others using the facility, and the officer had previously been on the premises, implying CTA approval of his presence. Likewise, in *People v. Johnson* (1974), 21 Ill. App. 3d 769, 315 N.E.2d 579 (abstract), the court held that no warrant was required for police entry into a pool hall open to the public (also see *People v. Lerch* (1966), 77 Ill. App. 2d 151, 221 N.E.2d 664 (abstract), in which the court held that it was not a search where a police officer without warrant "caught a glimpse" of a slot machine through a partially open door of a room in a gasoline filling station). Thus, the question before us here is whether the warrantless, nonconsensual entry into the furniture warehouse was permissible.

■■ The law is clear that police officers may make a warrantless entry of a private residence to effectuate a felony arrest if probable cause and exigent circumstances exist. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371; *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543.) Furthermore, we interpret *Mancusi* as providing fourth amendment protection to business or commercial premises against warrantless searches and seizures if there exists "a reasonable expectation of freedom from government intrusion." Although it did not address the question of a warrantless entry by the police for the purpose of making a felony arrest, by reading *Mancusi* in the light of *Payton* and *Abney*, we believe that defendants here did have a reasonable expectation of freedom from governmental intrusion into the warehouse to make an arrest. While such expectation may be diminished in the context of commercial or business premises, it is unnecessary to decide that question since the standards of *Payton* and *Abney*, as applied to private residences, were satisfied in the present case.

■■ It is apparent, first of all, that probable cause existed to arrest Carl Branch. As stated in *People v. Thompson* (1981), 93 Ill. App. 3d 995, 1001-02, 418 N.E.2d 112, 118:

"A police officer has probable cause to arrest without a warrant, 'when the facts and circumstances within his knowledge and of which he has reasonable and trustworthy information are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested is guilty.' [Citation.] Whether probable cause for an arrest exists depends upon the totality of the facts and circumstances known to the arresting officer when the arrest is made. [Citation.] In deciding the question of probable cause, courts are not disposed to be unduly technical, and the determi-

nation is to be based on the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. \*\*\* Where a trial court conducts a lengthy hearing on this issue and determines that the officers had probable cause to arrest the defendant, courts of review will not disturb this finding unless manifestly erroneous. [Citation.] A ruling on a motion to suppress is not final and may be changed or reversed at any time. [Citation.] Consequently, a reviewing court in passing upon the trial court's ruling may consider testimony adduced at trial as well as at the pretrial hearing. [Citation.]"

In the present case there was testimony at the hearing on the motion to suppress that Investigator Zito had received an informant's tip that a large narcotics transaction was to occur in the area of the warehouse, possibly involving persons who were armed and dangerous. Later, as the investigators approached the building, they observed Carl Branch holding a plastic container of white powder in his hand with his arm outstretched toward two other individuals. When the squad car was 25 to 30 feet away, Branch dropped the container and fled into the building. Then Zito, who had made some 500 narcotics retrievals, picked up the container—believing the substance to be cocaine or heroin. A police officer investigating possible criminal conduct may rely upon his knowledge and experience and the reasonable inferences drawn from observed facts. (*People v. Crawford* (1978), 64 Ill. App. 3d 861, 381 N.E.2d 1183.) Accordingly, we conclude that the officers had probable cause to believe Branch had committed the offense of illegal possession of a controlled substance.

Applying the criterion of exigent circumstances, we note that several factors have been set forth in determining if such circumstances exist. As stated in *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 65-66, 405 N.E.2d 1121, 1127, the following factors are considered in order to justify a nonconsensual entry into a home to arrest a suspect:

" ' "(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect 'is reasonably believed to be armed'; (3) 'a clear showing of probable cause \*\*\* to believe that the suspect committed the crime'; (4) 'strong reason to believe that the suspect is in the premises being entered'; (5) 'a likelihood that the suspect will escape if not swiftly apprehended'; and (6) the peaceful circumstances of the entry." ' [Citations.]"

Additional factors considered are (1) the need for prompt action by the arresting officers after receiving information establishing probable cause; (2) no deliberate or unjustified delay by the police during which

time a warrant could have been obtained; and (3) the reasonable belief that the suspect may be armed and violent. (*People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543; also see *People v. Patrick* (1981), 93 Ill. App. 3d 830, 417 N.E.2d 1056.) All such factors need not be established but only satisfied on balance. *People v. Thompson* (1981), 93 Ill. App. 3d 995, 418 N.E.2d 112; *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 405 N.E.2d 1121.

Here, in addition to having probable cause to arrest Branch, the officers had reason to believe he was inside the premises and possibly armed. Although Branch's possession of a controlled substance might not be regarded as a grave crime, the officers had reason to fear violence based on the informant's tip and the circumstances of the transaction. Their actions also were prompt, and there was no undue delay between the time probable cause was established and their entry of the premises. Moreover, upon seeing the officers, Branch immediately fled into the warehouse, thereby creating the likelihood he would escape if not swiftly apprehended. We conclude, therefore, that the officers' entry into the building was, on balance, consistent with the requirements of *Payton* and *Abney.*

Furthermore, we think it clear that in light of the above stated principles, there was probable cause to arrest Hilmon Stamps. The record indicates that the investigators had been informed of a narcotics transaction, and when they entered the building they were in pursuit of Branch, whom they had observed in possession of narcotics. Significantly, Zito first observed Hilmon on the second floor, standing near Branch, and after Zito announced his office and ordered Hilmon to stop, Hilmon failed to comply but, instead, fled into the lavatory carrying the leather bag. Deliberately furtive actions and flight at the approach of police officers are properly considered strong factors in the decision to make an arrest. (*People v. Addison* (1977), 56 Ill. App. 3d 92, 371 N.E.2d 1025.) When Zito entered the lavatory, he observed the bag lying on top of the wastebasket under the sink and Hilmon standing to his right. Thus, based upon the totality of the circumstances, we find there were reasonable grounds for the officers to believe that Hilmon had committed the offense of illegal possession.

Concerning the search and seizure of the leather bag, we further conclude that the arresting officers' conduct here obviated the warrant requirement on two grounds. The search was, first of all, incident to a lawful custodial arrest. In *Chimel v. California* (1969), 395 U.S. 752, 762-63, 23 L. Ed. 2d 685, 694, 89 S. Ct. 2034, 2040, the supreme court defined the scope of a proper warrantless search incidental to an arrest:

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."

In the present case, when Zito entered the lavatory in pursuit of Hilmon, he observed the leather bag lying on top of a wastebasket underneath the sink and defendant standing to his right. Under those circumstances, it was reasonable for Zito to conclude that Hilmon could have gained possession of a weapon or destroyed the evidence in the bag. Indeed, seeing Hilmon run into the lavatory, Zito could have inferred that he would have flushed the narcotics down the toilet or poured it down the sink. (*Cf. People v. Blake* (1981), 93 Ill. App. 3d 538, 417 N.E.2d 682.) Given the evasive conduct of Branch, Zito also was warranted in believing that another person might come to the assistance of Hilmon, a factor which may be considered in defining the permissible scope of a search incident to an arrest. See *People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681, *cert. denied* (1974), 419 U.S. 1026, 42 L. Ed. 2d 302, 95 S. Ct. 506.

Our decision here is consistent with other cases which have applied the *Chimel* standard. In *People v. Williams* (1974), 57 Ill. 2d 239, 244, 311 N.E.2d 681, 684, the search of a dog food bag 7 to 10 feet from defendant was upheld. In *People v. Robinson* (1978), 62 Ill. App. 3d 900, 379 N.E.2d 1264, the search of a bag in a closet 6 to 8 feet away from defendant was found valid. Similarly, in *United States v. Wysocki* (5th Cir. 1972), 457 F.2d 1155, *cert. denied* (1972), 409 U.S. 859, 34 L. Ed. 2d 105, 935 S. Ct. 145, the court upheld the search of a box inside a bag in a closet 6 feet away from defendant who was seated in a chair and was guarded by a police officer. Finally, in *United States v. Patterson* (10th Cir. 1971), 447 F.2d 424, *cert. denied* (1972), 404 U.S. 1064,

30 L. Ed. 2d 752, 92 S. Ct. 748, the search of a kitchen shelf 4 to 6 feet from defendant was upheld although 5 police officers were guarding defendant. We think it clear, therefore, that in light of the particular facts presented and of the case law, the search of the bag conducted contemporaneously with the arrest of Hilmon was proper.

The circumstances of this case also satisfy the requirements of the plain view exception to the warrant requirement. (See *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022.) Applying *Coolidge*, the court in *People v. Montgomery* (1980), 84 Ill. App. 3d 695, 698, 405 N.E.2d 1275, 1278, stated:

> "[A]n arresting officer may seize evidence within a dwelling that inadvertently comes into plain view, even though outside the area under the immediate control of the arrestee. [Citations.] However, this seizure is proper only when three conditions are met: (1) the object seized is in plain view; (2) the officer views the object from a position where he has a right to be; and (3) the facts and circumstances known to the officer at the time he acts give rise to a reasonable belief that the object seized constitutes evidence of criminal activity. [Citation.]"

It appears from the record that Zito observed the bag from a place where he had a right to be. Having made a lawful entry into the building and having determined that probable cause existed to arrest Hilmon Stamps, the officer had the right to enter the lavatory to make the arrest. Secondly, given the informant's tip, Hilmon's evasive behavior, and Zito's own observation of the bag as an experienced narcotics investigator, he had reason to believe that the leather bag was evidence of illegal possession of a controlled substance. It also seems clear from Zito's testimony at trial that the leather bag together with its contents of plastic bags of white powder were in plain view. Accordingly, we believe that the narcotics were properly seized in accordance with the requirements of the plain view doctrine.

Applying the same principles as discussed above to the seizure of the items from the room in which Billy Stamps was found, we also think it clear that those items were seized in a search incident to a lawful custodial arrest and that they were in plain view. As noted previously, after Zito apprehended Hilmon and turned him over to Mokstead, he entered the office area of the warehouse. There he observed Branch throwing plastic bags of white powder against the wall and Billy crouched down and running to Zito's right. Zito ordered Billy to stop, but he failed to comply; consequently, Zito threw the sledgehammer and reached for his revolver. After the lights went on, Zito observed Branch with white powder on his hands and clothing. The floor

immediately in front of him was covered with white powder, and more white powder was spread on the wall. On one desk there were a scale, a mixer, and two plastic bags of white powder, and on the other desk there were a large plastic bag of white powder and numerous other plastic bags—some of which contained quantities of white powder. Two revolvers also were recovered from a desk drawer in the office. The three individuals in the room were then arrested and the room secured while Mokstead searched for weapons. Seeing an open section in the ceiling, Mokstead recovered the brown paper bag containing brown powder, while Branch, Billy, and Ruby Thomas—none of whom had as yet been handcuffed—were standing almost directly underneath the area.

It is thus apparent from those facts that the seizure of the items in question was made pursuant to a lawful custodial arrest. The search was carried out contemporaneously with the arrest of Billy and when none of the three individuals were handcuffed. The items were only a few feet away and thus in an area from within which the arrestees might obtain a weapon or destructible evidence. Indeed, when Zito entered, he could reasonably have inferred that Branch was in the process of destroying evidence and that Billy was going toward a desk containing revolvers. It is also significant that when Mokstead recovered the bag from the ceiling, the three arrestees were standing almost directly below.

We think it equally clear that the powder on the wall, the clear plastic bags, the mixer, and the scale were in plain view of the arresting officers; that the items were seen from a position where they had a right to be; and that, in light of the circumstances before them and their experience, they could reasonably believe the items constituted evidence of criminal activity.

In summary, a trial court's ruling on a motion to suppress evidence should not be disturbed unless manifestly erroneous. (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) Based on the record before us, we hold that the evidence in question was not improperly seized, and denial of the motion to suppress was not error.

We next consider Billy Stamps' contention that he was not proved guilty beyond a reasonable doubt of the offenses of possession and delivery of controlled substances. He maintains that the State's evidence proved only his mere presence at the scene.

Proof of the crime of unlawful possession of controlled substances requires that the State establish that the accused had knowledge of the presence of the narcotics and that the narcotics were within his immediate and exclusive control. (*People v. Nettles* (1961),

23 Ill. 2d 306, 178 N.E.2d 361, *cert. denied* (1962), 369 U.S. 853, 8 L. Ed. 2d 12, 82 S. Ct. 939; *People v. Miller* (1981), 97 Ill. App. 3d 970, 423 N.E.2d 1152.) Because knowledge is seldom susceptible of direct proof, it may be proved by evidence of acts, declarations, or conduct from which it is reasonable to infer that the accused knew of the existence of the narcotics at the place they were found. (*People v. Bell* (1972), 53 Ill. 2d 122, 290 N.E.2d 214.) Moreover, actual physical possession need not be demonstrated in order to sustain such conviction if constructive possession can be inferred from the facts. (*People v. Matthews* (1959), 18 Ill. 2d 164, 163 N.E.2d 469; *People v. Townsend* (1980), 90 Ill. App. 3d 1089, 414 N.E.2d 483.) Constructive possession has been defined as "that which exists without actual personal present dominion over a chattel, but with an intent and capability to maintain control and dominion." *People v. Fox* (1962), 24 Ill. 2d 581, 585, 182 N.E.2d 692, 694.

■ The significance of the element of control in establishing constructive possession was explained in *People v. Nettles* (1961), 23 Ill. 2d 306, 308-09, 178 N.E.2d 361, 363, wherein the court stated:

> "[W]here narcotics are found on premises under defendant's control, it may be inferred that the defendant had both knowledge and control of the narcotics. This inference is based largely upon the nature of the commodity and the manner in which its illegal traffic is conducted. *** [S]ince [the] mere possession [of narcotics] may subject [a] person to severe criminal consequences, the narcotics traffic is conducted with the utmost secrecy and care. Human experience teaches that narcotics are rarely, if ever, found unaccountably in a person's living quarters.

> We are of the opinion, therefore, that where narcotics are found on the premises under the control of defendant, this fact, in and of itself, gives rise to an inference of knowledge and possession by him which may be sufficient to sustain a conviction for unlawful possession of narcotics, absent other facts and circumstances which might leave in the mind of the jury *** a reasonable doubt as to his guilt."

As the reasoning of *Nettles* suggests, making illegal the constructive possession of controlled substances reflects the widely-held judicial belief that such possession is evidence of illicit purposes on the part of the accused and that the mass distribution of those substances poses a public danger. (See G. Fletcher, Rethinking Criminal Law sec. 3.4, at 200-01 (1978).) Finally, the questions of knowledge and possession are decisions for the trier of fact, and its findings will not be disturbed on review unless the evidence is so palpably contrary to the verdict or so

unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of guilt. *People v. Galloway* (1963), 28 Ill. 2d 355, 192 N.E.2d 370, *cert. denied* (1964), 376 U.S. 910, 11 L. Ed. 2d 608, 84 S. Ct. 665; *People v. Ortiz* (1980), 91 Ill. App. 3d 466, 414 N.E.2d 1072.

■ In our view, the evidence establishes that Billy Stamps, through the control he exercised over the premises where the narcotics were found, not only had knowledge of the presence of the narcotics but also that he had constructive possession of them. The control which Billy exercised over the premises where the substances were found was demonstrated primarily through evidence of a land trust agreement involving Billy. That agreement was presented in evidence as the State's Group Exhibit No. 11 and viewed by the jury during deliberations, and it was explained through the testimony of Steven Dixon, a law graduate employed as a trust officer at the American National Bank (the Bank). Dixon testified that he was familiar with the procedures and purposes for the Bank's keeping of land trust records; that the warehouse located at 4654 West Madison Street was held in a land trust with the Bank as trustee, which trust was recorded at the Bank; that the records for the instant trust had been made in the ordinary course of business; that it was the Bank's ordinary course of business to make such records; that under the terms of the trust, Billy and his mother had the "power of direction" by which they could direct the trustee to sell the property or to execute other documents pertaining to title to the property, including the execution of a lease or mortgage. Thus, while it appears that Billy and his mother exercised joint control over the building, such control is sufficient, in our view, for purposes of proving unlawful possession. (See *People v. Embry* (1960), 20 Ill. 2d 331, 169 N.E.2d 767; *People v. Miller* (1981), 97 Ill. App. 3d 970, 423 N.E.2d 1152; *People v. Kline* (1976), 41 Ill. App. 3d 261, 354 N.E.2d 46.) The requirement of exclusive control of the premises on the part of the accused does not permit him to defeat prosecution under facts similar to those presented here simply by a showing of joint control. See *People v. Ortiz* (1980), 91 Ill. App. 3d 466, 414 N.E.2d 1072.

■ We further conclude that, contrary to the contention of Billy Stamps, the testimony of Dixon was admissible. Although defendants objected to the introduction of the land trust agreement records, they failed to specify that issue in their post-trial motion for a new trial and, thus, waived consideration thereof on review. (See Ill. Rev. Stat. 1979, ch. 38, par. 116—1; *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Assuming no waiver, it is nonetheless apparent that the trust agreement and Dixon's explanation of it were properly admissible.

As to the trust agreement documents, it is clear that such were admissible under the business records exception to the rule excluding hearsay. That exception requires that, to be admissible, a business record be made in the regular course of business and that it is in the regular course of business to make a record. (Ill. Rev. Stat. 1979, ch. 38, par. 115—5; 73 Ill. 2d R. 236; *People v. Lewis* (1977), 52 Ill. App. 3d 477, 367 N.E.2d 710.) Both foundational requirements were satisfied here through Dixon's testimony. Further, while Dixon was not qualified as an expert witness, his testimony was admissible for the purpose of explaining certain terms of the trust agreement. The opinions and conclusions of a nonexpert witness are admissible if the witness has special knowledge of and familiarity with a given subject matter. (*Lawson v. Belt Ry. Co.* (1975), 34 Ill. App. 3d 7, 339 N.E.2d 381; *State Farm Mutual Automobile Insurance Co. v. Short* (1970), 125 Ill. App. 2d 97, 260 N.E.2d 415.) In the present case, we think there was substantial need for Dixon's explanation of various terms of the trust agreement in order to make the trust comprehensible to the jury and aid them in their deliberations. It was, therefore, properly admissible.

We also reject Billy Stamps' contention as to remarks of the prosecutors in closing argument concerning Billy's control of the premises. Defendants specifically maintained that the prosecutors improperly argued that Billy controlled the premises where the narcotics were found. In our view, however, the trust agreement and Dixon's explanatory testimony were evidence of such control which the jury could properly consider. Great latitude is allowed the prosecution in closing argument, and the trial court's determination of the propriety of such remarks will not be disturbed on review absent an abuse of discretion. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847.) Arguments and statements based upon the facts in evidence or upon legitimate inferences drawn therefrom are within the bounds of proper argument. (*People v. Dominique* (1980), 86 Ill. App. 3d 794, 408 N.E.2d 280.) Evidence of the trust agreement and of Dixon's testimony, combined with that of Billy's presence on the premises at the time of his arrest, leads us to conclude that the prosecutors' remarks were not beyond the scope of proper comment.

Furthermore, Billy's control over the premises is supported by several additional factors. First, the electricity service was billed to "W. Stamps, doing business as Stamps Brothers Furniture," and aside from Billy, no one else in the Stamps family had a first name beginning with the letter "W". Secondly, Billy was present inside the warehouse at approximately 3:30 a.m. when the police arrived. Thirdly, after being arrested and prior to being taken to the police station, Billy

handed his brother-in-law Paul Jackson a set of keys, which act the jury could infer was intended to secure the warehouse, and defendants do not contend that those keys did not belong to Billy.

Other evidence also corroborates Billy's possession of the narcotics. The police discovered him in the office area along with quantities of controlled substances. Objects such as a mixer and a scale also were recovered, and the jury could infer that those objects were related drug paraphernalia. Neither was it unreasonable for the jury to infer that defendant's presence in the office under those circumstances established that he possessed the narcotics with the intent to sell and distribute them. (See *People v. Kline* (1976), 41 Ill. App. 3d 261, 354 N.E.2d 46.) Furthermore, Billy's furtive and evasive actions in crouching and running when Zito entered and his refusal to halt when ordered to do so could reasonably be regarded as indicative of a man aware of the unlawful presence of controlled substances. If the fact of possession is proved, suspicious behavior in the vicinity of narcotics, while not sufficient to show constructive possession, is sufficient to show guilty knowledge. *People v. Ortiz* (1980), 91 Ill. App. 3d 466, 414 N.E.2d 1072.

With regard to Billy's account, although he testified that his presence was coincidental and that it was Branch, and not Hilmon, who had the leather bag and who, upon entering the office, threw "stuff" from it "every which way," the jury rejected that testimony. Resolution of such questions of credibility rests with the trier of fact. (*People v. Galloway* (1963), 28 Ill. 2d 355, 192 N.E.2d 370, *cert. denied* (1964), 376 U.S. 910, 11 L. Ed. 2d 608, 84 S. Ct. 665.) Moreover, we believe the jury could have properly concluded that the narcotics were in the office prior to Branch's entry, based on the evidence of the bag of heroin found in the ceiling, and the mixer, the scale, and the other untouched bags of white powder found on the desks.

In our view, the evidence at trial was not so palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of guilt for the crime of unlawful possession. We note, parenthetically, the stipulation as to the quantity of the substances involved and that such quantity found in the possession of the accused is circumstantial evidence from which the jury could properly conclude that the substances were not intended for personal use but were possessed with the intent to deliver. *People v. Goodman* (1979), 75 Ill. App. 3d 369, 393 N.E.2d 1233, *aff'd* (1980), 81 Ill. 2d 278, 408 N.E.2d 215; *People v. Kline* (1976), 41 Ill. App. 3d 261, 354 N.E.2d 46; also see *People v. Perine* (1980), 82 Ill. App. 3d 610, 402 N.E.2d 847.

Defendants next contend that the trial court erred in preventing

them from questioning the arresting officers as to an alleged Federal investigation into the officers' conduct, for the purpose of showing bias and motive. Defendants further contend that in quashing their subpoena for information possessed by the Federal government relating to the alleged investigation, they were precluded from showing, by Billy's testimony, the interest of the officers in securing convictions. We find no merit in those contentions.

The record discloses that prior to trial, Billy Stamps moved for a continuance and, in support thereof, he testified that two FBI agents had served him with a subpoena to appear before a Federal grand jury. Billy further stated that the agents told him that the subpoena pertained to a Federal investigation into the arresting officers' conduct during the arrest in question. It also appears that Billy had subpoenaed the FBI and the United States Attorney's Office for information regarding the alleged Federal investigation into the arrest of defendants. The trial court denied the motion for a continuance. At trial, defense counsel was permitted to argue police misconduct but was barred from mentioning the alleged investigation and from cross-examining Officer Zito on that matter. Following the close of the State's case, an assistant U.S. Attorney moved to quash the subpoenas and submitted a memorandum of law therewith, arguing that defendants had failed to comply with certain Federal statutes in connection with the subpoena and that the Federal government had no documents which were responsive thereto except those exempted from disclosure. The trial court granted the motion to quash. The trial court also granted the State's motion *in limine* barring Billy from testifying as to the Federal subpoena he had received and the alleged conversations he had had with Federal agents. The offer of proof as to what Billy's testimony would be was in substance the same as that asserted with the motion for a continuance, and the State's offer of proof was, in essence, that if called the Federal agents would deny having made such statements to Billy.

■ ■ It is unnecessary to address each point asserted by the parties with respect to this issue inasmuch as the offers of proof as to the alleged Federal investigation were based principally on the hearsay declarations of Billy Stamps. In addition, the barring of cross-examination into the alleged investigation was not, in our view, prejudicial to Billy since the record demonstrates that Zito was extensively cross-examined as to his conduct during the arrest. Thus, the opportunity to establish that Zito had a motive to lie or was biased was fully explored. Wide latitude is generally given a defendant in cross-examination for purposes of establishing a witness's bias or motive to give false testi-

mony (*People v. Mason* (1963), 28 Ill. 2d 396, 192 N.E.2d 835), and a court of review will not disturb the trial court's ruling as to the scope of such cross-examination absent an abuse of discretion resulting in manifest prejudice to defendant (*People v. Bradford* (1979), 78 Ill. App. 3d 869, 397 N.E.2d 863). In the instant case, we find no abuse of discretion. We also believe the trial court properly quashed the subpoena served upon the U.S. Attorney, since it is undisputed that the documents sought consisted of confidential information protected from disclosure. (See 5 U.S.C. sec. 552b(c)(7)(d) (1976); Fed. R. Crim. P.6(e).) Finally, we conclude that the trial court properly granted the State's motion *in limine* since the excluded testimony consisted principally of hearsay, so that there was in essence nothing properly before the court. Accordingly, we find no reversible error in the trial court's rulings. See *People v. Williams* (1978), 60 Ill. App. 3d 529, 377 N.E.2d 367; *People v. McClain* (1978), 60 Ill. App. 3d 320, 376 N.E.2d 774; *People v. Devine* (1977), 55 Ill. App. 3d 576, 371 N.E.2d 22.

Turning next to the question of the jury instructions, Billy first contends that the trial court erred in refusing to give a defense non-IPI instruction to the effect that one's mere presence at the scene where narcotics are found is insufficient evidence to prove possession. We disagree.

 █ It is well settled that mere presence at or about the scene of a crime does not alone establish guilt (*People v. Nugara* (1968), 39 Ill. 2d 482, 236 N.E.2d 693, *cert. denied* (1968), 393 U.S. 925, 21 L. Ed. 2d 261, 89 S. Ct. 257; *People v. Clark* (1963), 30 Ill. 2d 67, 195 N.E.2d 157) and that the accused and the State are entitled to appropriate instructions which present their respective theories of the case to the jury if such theories are supported by the evidence (*People v. Unger* (1977), 66 Ill. 2d 333, 362 N.E.2d 319; *People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827) even though the quantum of such evidence is slight (*People v. Kalpak* (1957), 10 Ill. 2d 411, 140 N.E.2d 726; *People v. Rodriguez* (1981), 96 Ill. App. 3d 431, 421 N.E.2d 323). In the present case, however, we believe that the instructions given incorporated Billy's theory of defense and adequately informed the jury of the parties' respective theories of the case.

Among the instructions of record, the following are pertinent:

"Possession is a voluntary act if the offender knowingly procured or received the thing possessed, or was aware of his control thereof for a sufficient time to have been able to terminate his possession." State's No. 11, Illinois Pattern Jury Instructions, Criminal, No. 4.15 (1968).

"A person commits the offense of possession of a controlled

substance when he or she knowingly and unlawfully possesses a controlled substance." State's No. 14 (non-IPI).

"A person is in possession of a thing when it is knowingly in his or her immediate and exclusive control.

Possession may be actual or constructive. When a person knowingly has direct physical control over a thing, he or she is then in actual possession. A person who lacks actual physical possession of a thing but who has control over the area where a thing is found, (either directly or through another person) is then in constructive possession.

Such control may be shared jointly with others and still be exclusive." State's No. 15 (non-IPI).

"To sustain the charge of possession of a controlled substance, the State must prove the following proposition:

That a defendant knowingly and unlawfully possessed 30 grams or more of a controlled substance.

If you find from your consideration of all the evidence that this proposition has been proved beyond a reasonable doubt as to a defendant, then you should find that defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that this proposition has not been proved beyond a reasonable doubt as to a defendant, then you should find that defendant not guilty." State's No. 16 (non-IPI).

 In our view, those instructions were accurate statements of the law of possession, as discussed hereinabove and as applicable to the instant facts. Further, they informed the jury that if it found Billy knowingly exercised immediate and exclusive control over the narcotics, he was guilty of illegal possession. Conversely, the jury also was informed that if Billy did not knowingly exercise such immediate control, he was not guilty. Thus, we believe the jury was fully aware that Billy's "mere presence" was insufficient to convict—a conclusion which is evident from the jury's acquittal of Ruby Fay Thomas and from the closing arguments of Billy's and her counsel to that effect. We note, in addition, that a mere-presence instruction, like the one tendered here, has in a similar context been held to be redundant. *People v. Craig* (1979), 79 Ill. App. 3d 584, 399 N.E.2d 168; also see *People v. Mancl* (1977), 55 Ill. App. 3d 41, 370 N.E.2d 664.

 ██ Furthermore, the decision whether to give a non-IPI instruction rests within the sound discretion of the trial court (*People v. Larson* (1980), 82 Ill. App. 3d 129, 402 N.E.2d 732; *People v. Blackwell* (1979), 76 Ill. App. 3d 371, 394 N.E.2d 1329), and only if there is no IPI instruction which accurately states the applicable law should a

non-IPI instruction be given (73 Ill. 2d R. 451(a); *People v. Dordies* (1978), 60 Ill. App. 3d 621, 377 N.E.2d 245). Accordingly, we conclude that the trial court did not abuse its discretion in refusing Billy's proffered instruction.

 Finally, we find no merit to the contention that the trial court erred in giving the State's No. 15 instruction,[2] which provided that defendants could be convicted of illegal possession if they controlled the "area" where the narcotics were found rather than the "premises," as defendants requested in their tendered instruction. As stated in *People v. Dordies* (1978), 60 Ill. App. 3d 621, 625, 377 N.E.2d 245, 249:

> "The sole function of instructions is to convey to the minds of the jury the correct principles of law applicable to the evidence submitted to it in order that, having determined the final state of facts from the evidence, the jury may, by the application of proper legal principles, arrive at a correct conclusion according to the law and the evidence. [Citation.] Further, jury instructions should be neither misleading nor confusing, and should fully and fairly inform the jury of the applicable law. [Citations.]"

We note in this regard that the particular term required in the definition of constructive possession is determined by the factual setting. (See, *e.g.*, *People v. Rhoades* (1979), 74 Ill. App. 3d 247, 392 N.E.2d 923 (possession may be inferred where narcotics are found in an "area" under defendant's control); *People v. Day* (1977), 51 Ill. App. 3d 916, 366 N.E.2d 895 (constructive possession requires showing that defendant had immediate exclusive control of area or premises where items were situated); *People v. Kane* (1975), 31 Ill. App. 3d 500, 333 N.E.2d 247 (the presence of narcotics in a "place" over which defendant has control permits inference of possession).) The State's No. 15, as set forth above, when viewed in the entirety of the jury instructions, adequately explained the applicable law. Moreover, the definition of constructive possession as control over the "area" was, in our view, more applicable to the instant set of facts than defendants' tendered instruction using "premises," since the State's No. 15 more accurately set forth the circumstances upon which an acquittal was required.

The record discloses that Ruby Thomas and Billy Stamps were discovered in an office area which contained controlled substances and apparently related drug paraphernalia. Within that context and in

---

[2]The State's No. 15 was incorrectly designated as IPI Criminal No. 17.01, a mistake we believe to be inconsequential.

light of the jury instructions as a whole, the jury was to determine who controlled the office area where the narcotics were found. The instruction as given also avoided potential confusion. Had possession been defined as control over the premises, counsel for Ruby Thomas could have argued that since Billy controlled the "premises," *i.e.*, the warehouse, Ruby Thomas could not have been found guilty under a theory of constructive possession. As to Hilmon Stamps, there was a question of the credibility of Investigator Zito's testimony that Hilmon actually possessed the bag containing narcotics as opposed to Billy's testimony that Branch possessed the bag. Defining constructive possession in terms of the "area" was beneficial to Hilmon since the evidence indicated that he was not in the office. Had the term "premises" been used, Hilmon could have been convicted on a constructive possession theory since he was in the building—even though he was not in the office and apparently had no knowledge of what transpired. Thus, the instruction as given avoided prejudice to him. Accordingly, through the inclusion of the word "area," the jury's attention was directed to the immediate area where the narcotics were found, as well as to the question of who controlled the warehouse. We conclude, therefore, that the giving of the State's No. 15 was proper.

It should be noted, however, that we do not hold it proper for a trial court in all situations to modify an instruction *sua sponte* after argument and without the conference with the attorneys, as required by section 67 of the Civil Practice Act. (Ill. Rev. Stat. 1979, ch. 110, par. 67.) We have found only that under the facts and circumstances here, defendant was not prejudiced by the modification, because the instruction as given was proper.

For the reasons stated, the convictions and the sentences as to both defendants are affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.