THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROSE ANN THOMAS, Defendant-Appellant.

First District (5th Division)   No. 86—0861

Opinion filed September 30, 1988.

Paul P. Biebel, Jr., Public Defender, of Chicago (Richard E. Gade and Aaron L. Meyers, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Kim A. Novi, and Marilyn F. Schlesinger, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Defendant and Sheree Manning were charged by indictment with murder and armed robbery. A severance was ordered and Manning elected a bench trial, which was conducted simultaneously with defendant's jury trial. Following that trial, defendant was found not guilty of murder but guilty of armed robbery and sentenced to a term of 10 years. On appeal, she contends that the trial court's refusal to give one of the defense-tendered jury instructions prevented consideration by the jurors of her theory of defense and denied her the right to assistance of counsel in presenting that defense.

The charges arose from the robbery and strangulation death of Flora Marshall, whose body was discovered in her third-floor room at about 6 a.m. on March 20, 1985, by another tenant of the apartment building located at 4437 South Prairie Avenue in Chicago. Prior to trial, defendant's motions to suppress a statement and quash a consent-to-search form which she signed were denied. According to the various State witnesses and the summary of defendant's post-arrest statement, which was read to the jury, defendant and Manning had spent the night of March 18 at the third-floor apartment of defendant's stepfather, Jimmy Walker. The following morning, Walker asked his nephew, Fred, to accompany Marshall to cash her public aid check and upon their return Marshall gave Walker $100 for her rent. Later that afternoon, defendant, Manning and Marshall left the building to go to a store. Defendant stopped to talk to some children but met Marshall and Manning a short time later at a liquor store/bar. Marshall then went to a lounge across the street, sat at the bar and ordered a beer. A few minutes later, defendant and Manning entered the lounge across the street, sat at the bar and ordered a beer. A few minutes later, defendant and Manning entered the lounge and sat in a booth, but did not order anything to drink. After about 30 minutes, Marshall stated to a friend, George, that she wished to go home. He

called for a taxi and instructed the driver to take her and another woman at the lounge to their homes, but as Marshall entered the cab, defendant and Manning exited the lounge and tried to force their way in with her. George then took Marshall back inside the lounge and, before leaving, asked a man he knew as "J.C." to look after her because "it look[ed] like the girls [were] going to give [Marshall] some trouble." While in the lounge, Marshall told another acquaintance, Jean, that she had received and cashed her public aid check, displayed the money and offered to buy Jean a drink. When Jean announced that she was leaving, Marshall asked her for a ride home. Defendant and Manning followed Marshall outside, told Jean they lived in the same building as Marshall and asked to be dropped off there with her. When they arrived there, they exited the car and went into the building while Marshall stood next to the car talking to Jean. According to defendant's statement she and Manning walked up to the second-floor landing to wait for Marshall and carry out their day-long plan to rob her. When Marshall came up the stairs, Manning grabbed her around the neck and, with defendant leading the way, walked her up the stairs to her third-floor room. When Marshall attempted to call out to Walker for help, Manning removed some tissue from her pocket and stuffed it in Marshall's mouth; defendant turned and punched her in the eye. Once inside Marshall's room, defendant looked through a wallet which was on the table and then began searching through the dresser drawers. Meanwhile, Manning forced Marshall to lie facedown on the floor and tied a sock around her mouth. Defendant and Manning each pulled one of Marshall's arms behind her back, tied her hands and then turned her onto her back. As defendant resumed her search of the room, Manning broke an empty Canadian Mist whiskey bottle and cut Marshall's thighs, which were exposed because her pants and underwear had been pulled down. Although they did not find any money, Manning did find $20 worth of food stamps, which she gave to defendant, and Manning also took some clothing and a ceramic vase. When they left the room, Marshall was still moving.

The State also presented the testimony of two young women, Audrey and Linda, who resided in the same building where Marshall and Manning lived. They testified that late in the evening of March 19, they were walking north on State Street when they saw defendant and Manning coming from the opposite direction. Either defendant or Manning called out to Audrey, who then walked toward them, while Linda and her two-year-old child waited between 12 and 30 feet away. Defendant, with Manning standing beside her, told Audrey, in a normal tone of voice, that Manning "had cut the lady's legs" and that

she "believed the woman was dead," with which Manning concurred. In Audrey's words, defendant and Manning both "acted like [it was] a laughing matter, that nothing had happened." After a few minutes, Linda approached the group to urge Audrey to leave and heard Manning say, "Don't tell nobody."

Marshall's body was discovered early the next morning by another tenant of the third floor, Mary Lewis, after she noticed Marshall's nightgown on the floor in the hallway near the common bathroom and that the door to Marshall's apartment was open. Marshall's partially naked body was lying faceup on the floor, her wrists were tied behind her back and the dresser drawers and the contents thereof were strewn on the bed and about the room. The responding officer also found pieces of bloody tissue next to the body and a broken whisky bottle across the room. A palm print taken from the refrigerator matched defendant's, as did hair samples found on the ligature removed from Marshall's neck. In his external examination of the body, the medical examiner observed multiple abrasions on Marshall's chin, neck, face and fingers, two small puncture wounds on her abdomen and cutting-wounds on her thighs and lower right leg. The internal examination disclosed hemorrhages under the scalp, forehead and left posterior region of the head, multiple hemorrhages around the larynx and a fracture of the right hyoid bone, from which he determined that the cause of death was strangulation. Laboratory tests measured Marshall's blood and bile alcohol levels to be .375 and .400, respectively.

Later that afternoon, on information from Walker that defendant had been with Marshall the night before, Detectives Markham and Lind went to her apartment, informed her that they were investigating the homicide of Marshall and requested that she accompany them to the police station, which she agreed to do. As they were leaving, defendant stated that Manning had been with her at Marshall's room the night before and asked that they stop at her apartment on a lower floor of the same building before going to the police station. Defendant spoke to Manning for a few minutes, following which the officers asked her to also accompany them to the police station. Both women were then taken to the Area 1 Violent Crimes division where, after being advised of their rights, they were separately questioned. Defendant stated that she wished to tell the truth and, in a 20-minute conversation, recounted to Officers Markham and Lind what had occurred the previous night. Sometime later, defendant repeated her statement to an assistant State's Attorney who prepared a summation of it which she read and, after directing the making of certain corrections, signed. She also signed a consent-to-search form and then ac-

companied the officers back to her apartment where they retrieved some of the items taken from Marshall's room.

On defense, Castadel King, defendant's "common-law husband" and the father of six of her nine children, testified that he was in the bathroom late in the evening of March 19 when he heard defendant and another female come into their apartment. At about 4 p.m. the following day, two police officers knocked on their door and told defendant they wished to talk to her concerning "a light robbery." He and defendant assembled the children and took them to her sister's apartment. The police then took defendant down to Manning's apartment before transporting both women to the police station. He also went to the station, and although he saw defendant when she was taken to the washroom, he was not allowed to speak to her until about 4 o'clock the next morning, at which time she appeared very tired and frightened.

Defendant testified that Marshall came to Walker's apartment at 9 or 10 a.m. on March 19 with a drink in her hand and asked for assistance in cashing her public aid check. A man named Fred escorted her to a currency exchange, and when they returned Marshall gave Walker $100 for her rent. She and Manning then accepted Marshall's invitation to come to her room for a drink of Canadian Mist whiskey, and before leaving with Manning and Marshall, she put the cup from which she had been drinking into the refrigerator. Once outside, she stopped to talk to some children while Manning and Marshall continued walking toward 43rd Street. She later met them at a liquor store/bar where Manning was talking to a man she knew only as "James." She and Manning then went to a lounge across the street where they again saw Marshall. An acquaintance of Marshall gave them a ride back to Marshall's building. She and Manning exited the car and went up to Walker's apartment while Marshall remained outside talking to her friend. A few minutes later, Marshall knocked on the door, invited them to her room and then asked her (defendant) to lend her $10 and to go out to buy some liquor. She and Manning walked a few blocks to a liquor store where they again saw "James." Manning conversed with James outside the store while she went in and purchased a bottle of whiskey and some cigarettes. Upon their return to the apartment building, she gave Manning the bag containing the purchases and went into the third-floor common washroom, where she remained for 10 to 15 minutes. When she opened the door to Marshall's apartment, she saw Marshall lying face-down on the floor with her jeans and underwear pulled down and her hands tied behind her back and James standing over her "doing something with his pants." The room was

"messed up" as though it had been searched. Manning then broke a bottle, and when James turned Marshall onto her back, Manning cut her thighs with the broken bottle. James warned her not to tell anybody, threatening to kill her and her children if she did. She assured him that he had nothing to worry about, stating, "I'm not involved in this s---; I'm fixing to leave." She left immediately and was only a short distance from the building when James and Manning exited the front door. James turned and walked south toward 47th Street, and Manning, who was carrying two bags, joined her as she walked north toward 43d Street. When they stopped to speak to Audrey and Linda, she (defendant) commented, "I think that woman is dead. [Manning] cut that lady." Manning followed her up to her apartment, at which time she noticed blood on Manning's jacket. She did not notice what Manning did with the two bags, and when Manning left she went to bed.

According to defendant's testimony, when the police arrived at her apartment the following afternoon, they told her that she was under arrest for robbery but acceded to her request that she not be handcuffed in the presence of her children. After accompanying her and the children to her sister's apartment, they took her to Manning's apartment and then to the police station. She was at first locked inside a small, windowless room with no furniture where, despite being pregnant, she was left alone for an extended period of time. When she knocked on the door asking to be released an officer outside said, "[S]hut up bitch," but later, when she began to feel nauseous and experience difficulty breathing she was given a cold towel for her head and taken to another room where the officers began to question her about a murder. She repeatedly told them that she "didn't do it," but they accused her of lying. The assistant State's Attorney then composed a two- or three-page statement and told her that if she signed it, as well as several other papers he brought in, she could go home. She signed all of the papers presented to her after which the officers took her back to her apartment where she gave them a statue and a doll Manning had taken from Marshall's room and left on the sink in her (defendant's) apartment upon their return there the previous night. Defendant once again denied participation in the murder or robbery of Marshall and stated that she did not tell the police what she had witnessed out of fear for her and her children's safety.

After argument by counsel, the jury found defendant not guilty of murder but guilty of armed robbery. The trial court denied her post-trial motion, imposed a sentence of 10 years, and this appeal followed.

528

OPINION

Defendant's sole contention on appeal is that the trial court committed reversible error by refusing the instruction tendered by her counsel that "mere presence at the scene of the offense with the knowledge that an offense is being committed does not make one person legally responsible for the conduct of another person who is committing the offense." Defendant asserts that the omission of this instruction prevented jury consideration of her only theory of defense and negated her right to the assistance of counsel in presenting that theory to the jury.

■■■ It is fundamental that an accused, like the State, is entitled to the submission of appropriate jury instructions on the law applicable to the theory of defense if there was evidence introduced at trial in support of that theory (*People v. Unger* (1977), 66 Ill. 2d 333, 362 N.E.2d 319; *People v. Stamps* (1982), 108 Ill. App. 3d 280, 438 N.E.2d 1282; *People v. Crutcher* (1979), 72 Ill. App. 3d 239, 390 N.E.2d 571; *People v. Walker* (1976), 44 Ill. App. 3d 494, 358 N.E.2d 672), but it is the trial court which determines, after consideration of the facts and the governing law, whether the jury should be instructed on a particular subject and, then, whether the Illinois Pattern Instructions in Criminal Cases (IPI-Criminal) contains an instruction which accurately states the law on that subject. (107 Ill. 2d R. 451(a).) If there is an appropriate IPI instruction, it must be used. (107 Ill. 2d R. 451(a).) However, the decision to give or refuse a non-IPI instruction is a matter within the sound discretion of the trial court. (*People v. Stamps* (1982), 108 Ill. App. 3d 280, 438 N.E.2d 1282; *People v. Craig* (1979), 79 Ill. App. 3d 584, 399 N.E.2d 168.) An abuse of discretion in the refusal of such an instruction occurs only where there is no IPI instruction applicable to the subject on which the jury should have been instructed (107 Ill. 2d R. 451(a); *People v. Stamps* (1982), 108 Ill. App. 3d 280, 438 N.E.2d 1282), and the jury was, therefore, left to deliberate without proper instructions (*People v. Craig* (1979), 79 Ill. App. 3d 584, 399 N.E.2d 168). Conversely, refusal to give a non-IPI instruction does not constitute an abuse of discretion if there *is* an applicable IPI instruction and/or the essence of the refused instruction is covered by other given instructions. *People v. Crutcher* (1979), 72 Ill. App. 3d 239, 390 N.E.2d 571; *People v. Walker* (1976), 44 Ill. App. 3d 494, 358 N.E.2d 672.

In the instant case, we note that while the proffered instruction on the law relating to "mere presence at the scene of the offense" is an essentially accurate statement of the law (*People v. Mancl* (1977), 55 Ill. App. 3d 41, 370 N.E.2d 664), it is a non-IPI instruction, which

reviewing courts have, on numerous occasions, ruled was properly refused at trial. In several cases, similar instructions were deemed redundant where IPI instructions on the presumption of innocence, the burden of proof and the quantum necessary to convict, the elements of the offense(s) charged and the law of accountability were given. (*E.g.*, *People v. Johnson* (1986), 150 Ill. App. 3d 1075, 502 N.E.2d 304; *People v. Stamps* (1982), 108 Ill. App. 3d 280, 438 N.E.2d 1282; *People v. Craig* (1979), 79 Ill. App. 3d 584, 399 N.E.2d 168; *People v. Crutcher* (1979), 72 Ill. App. 3d 239, 390 N.E.2d 571; *People v. Walker* (1976), 44 Ill. App. 3d 494, 358 N.E.2d 672). The courts reasoned, generally, that the essence of the "mere presence" instruction was already incorporated in or encompassed by those instructions—which advise the jury that a defendant must be found innocent unless the State has proved beyond a reasonable doubt that before or during the commission of the defined offense he/she, with the intent to promote or facilitate the commission of that offense, knowingly solicited, aided, abetted, agreed or attempted to aid the other person in the planning or commission of it—and that the juries were, therefore, fully and accurately apprised of the law constituting the theory of defense, *i.e.*, that mere presence at the scene of a crime or during its commission is insufficient to sustain a conviction. Further, in at least a few cases, courts have opined, as either the sole or an additional basis for their decisions, that the evidence at trial did not support a defense theory based on "mere presence" and that the proposed instruction was, in substance, nothing more than an assertion of innocence. *E.g.*, *People v. Johnson* (1986), 150 Ill. App. 3d 1075, 502 N.E.2d 304; *People v. Craig* (1979), 79 Ill. App. 3d 584, 399 N.E.2d 168; *People v. Mancl* (1977), 55 Ill. App. 3d 41, 370 N.E.2d 664.

Here, as in the above-cited cases, the jury was given the IPI instructions on the presumption of innocence, the State's burden of proof, the quantum of proof required for a guilty finding, the definition and elements of the offenses of murder and armed robbery as well as on the proof necessary for a finding of guilt on the basis of accountability. Additionally, defense counsel stressed during closing argument that although defendant was present and witnessed "James" and Manning rob and physically assault Marshall, she did not participate in any way and therefore could not be found guilty. Thus, we conclude that the jurors were fully and accurately instructed on the law applicable to the evidence presented in support of her theory of defense and were well aware from the instructions given that defendant's "mere presence" at or during the offenses was not sufficient to convict her of them. Indeed, we consider that an inescapable conclu-

sion from the jury's acquittal of her on the murder charge. The jury's rejection of her theory of defense in returning a guilty verdict on the armed robbery charge was clearly based on the evidence and cannot conceivably be attributed to a lack of full and accurate instruction by the fair and able trial judge who, the record reveals, conducted himself and the trials over which he presided in a most fair and exemplary manner. Accordingly, we hold that the court properly exercised its discretion in refusing the "mere presence" instruction submitted by defendant.

For the reasons stated, the judgment entered on defendant's conviction for armed robbery is affirmed.

Affirmed.

LORENZ, P.J., and MURRAY, J., concur.