THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALLISON JENKINS, Defendant-Appellant.
First District (6th Division) No. 1—87—3785

Opinion filed October 13, 1989.

116

118

Michael B. Brohman and Catherine A. Daubard, both of Jenner & Block, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Paula Carstensen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LaPORTA delivered the opinion of the court:

While investigating possible drug dealing in front of the Gayle Elementary School, Officers Fred Hattenberger and Jay Brunkella approached the defendant, Allison Jenkins, and another man. Although testimony conflicts as to what occurred, during a struggle between the defendant and Officer Hattenberger, Officer Hattenberger's gun discharged. The bullet struck Officer Brunkella in the chest, and he died 12 days later.

The defendant was charged with aggravated battery of Officer Hattenberger under section 12—4(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(b)(6)) and with the felony murder of Officer Brunkella under section 9—1(a)(1) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)).

At trial, the defendant moved for a directed verdict at the close of

the State's case, arguing that the State had not proven its case because it had not shown either that the defendant had the intent to commit the battery or that, if the defendant had committed the battery, the State had not proven that the battery was a direct cause of the felony murder. This motion was denied.

After the trial was completed, the jury found the defendant guilty of both the aggravated battery of Officer Hattenberger and the felony murder of Officer Brunkella. The defendant was sentenced to concurrent sentences of 5 and 20 years, respectively. The defendant appeals, raising the following issues: (1) Whether defendant's conviction was an unwarranted extension of the felony murder doctrine; (2) whether the non-Illinois pattern (IPI) jury instructions for felony murder were so erroneous that a new trial is required; (3) whether the trial court made erroneous evidentiary rulings which deprived the defendant of a fair trial; (4) whether the defendant should be granted a new trial because of prosecutorial misconduct; (5) whether the State fulfilled its burden of proving the causation, intent, and bodily harm elements of aggravated battery and felony murder; (6) whether the defendant should be granted a new trial because of ineffective assistance of counsel; (7) whether the trial court failed to give a proper deadlocked jury instruction and therefore the defendant should be granted a new trial; and (8) whether the defendant's penalty for conviction for felony murder was unconstitutional.

The two primary witnesses to the incident were the defendant and Officer Hattenberger, who told very different stories on the witness stand. The only portion which can be agreed upon is that as the defendant and Officer Hattenberger struggled and fell, Officer Hattenberger's Colt .45 "secondary" weapon discharged, and the bullet struck Officer Brunkella in the chest, causing his death.

### OFFICER HATTENBERGER'S TESTIMONY

According to Officer Hattenberger, on September 22, 1986, he and Officers Jay Brunkella, Tom Cotter, and Rick Myamotto were conducting a plainclothes surveillance of drug dealing in front of Gayle Elementary School, in the 1600 block of West Jonquil. Officers Hattenberger and Brunkella watched the area from the third floor of the school while Officers Cotter and Myamotto waited in a car nearby for Officers Hattenberger and Brunkella's radioed instructions to follow and stop any cars and question the occupants.

Shortly after arriving on the third floor, Officers Hattenberger and Brunkella saw a man identified as Michael Jones and two people in a car engage in what they believed to be a drug transaction. After

a radio transmission to Officers Cotter and Myamotto to stop the car, they saw the defendant approach Jones. Officer Brunkella identified the newcomer to Officer Hattenberger as Jenkins, and Officer Hattenberger testified that he knew the newcomer as Allison Jenkins.

The officers watched Jenkins approach a vehicle and lean inside. They saw hand movement between Jenkins and the driver of the vehicle, although they could not see what the movements were. The vehicle departed, and the defendant crossed the street carrying a potato chip bag, which he placed underneath the fence in front of the school. Officer Hattenberger testified that, based upon his experience, this indicated to him that the defendant was stashing drugs in the potato chip bag beneath the fence.

The defendant approached Jones. Officers Hattenberger and Brunkella decided to approach the two men together. Officer Brunkella walked west to retrieve the potato chip bag while Officer Hattenberger walked east to confront the defendant and Jones. According to Officer Hattenberger, the defendant looked up, saw Officer Hattenberger, and denied having anything on him. Officer Hattenberger replied "Come here. Take it easy. I just want to talk to you." The defendant took two or three steps toward Officer Hattenberger, making hand movements near his waist, then turned and ran out into the street. Officer Hattenberger testified that he saw no weapon.

Officer Hattenberger chased the defendant, yelling at him to stop. When the defendant did not stop despite repeated shouts to do so, Officer Hattenberger drew his gun with his right hand. He chambered a bullet. Officer Hattenberger testified that he wanted to have his gun loaded and ready to use because the defendant's actions, coupled with information that he had heard from unidentified sources on the street that the defendant carried a gun, led him to believe that the defendant was armed.

Officer Hattenberger chased the defendant until the defendant abruptly stopped and turned to face him approximately 15 feet away. Officer Hattenberger approached the defendant, who was again making hand movements about his waist, until Officer Hattenberger was close enough to grab the defendant's right arm with his left hand. The defendant relaxed, then when Officer Hattenberger relaxed, the defendant elbowed him in the chest and tried to run east. Because the defendant ran straight into Officer Hattenberger's arm, the officer pulled the defendant in to his body, "to try to get a grip on him," although on cross-examination Officer Hattenberger said that "I didn't say I pulled him into me. I said I had a grip on his left arm across the front of his body."

Officer Hattenberger testified that the defendant sought to break free of the officer's grip by swinging his arms. They fell, and as they did so Officer Hattenberger wrapped his right arm around the defendant.

At this time, Officer Hattenberger's gun discharged. He testified that he was sure he tensed as he fell, and that the shot occurred as they fell. Officer Hattenberger also testified that the gun did not discharge when the defendant elbowed him in the chest, but discharged as they fell.

Just before the struggle began, Officer Hattenberger looked up and saw Officer Brunkella to the defendant's right and slightly behind him, appearing to stand between the defendant and himself. When the shot went off, Officer Brunkella said he had been hit, and Officer Hattenberger radioed for help. Officers Cotter and Myamotto arrived at the scene within minutes. Officer Cotter attended Officer Brunkella, while Officer Myamotto arrested and handcuffed the defendant. Officer Hattenberger recovered his gun, then went to the school yard fence and retrieved the potato chip bag.

Officer Hattenberger testified to photographs admitted into evidence of a bruise which appeared "[a]bove my belly button and below my chest" taken two days after the incident.

### THE DEFENDANT'S TESTIMONY

The defendant testified that he was on the street in the 1600 block of West Jonquil on September 22, 1986, because he was on the way to a job cleaning carpets. A car stopped, and he spoke with two friends in the car, who gave him "a taste of potato chips," and as they drove off offered the defendant the remainder of the bag, which he finished and dropped the empty bag into the street. The defendant denied the prosecution's suggestion that there were any packets in the bottom of the bag.

The defendant testified that when he first saw Officer Hattenberger on September 22, 1986, he was entering the school yard with Officer Brunkella, whom the defendant knew because Officer Brunkella had previously arrested him. The defendant was standing on the street talking to Michael Jones and a second man on a bicycle. Officer Brunkella entered the school yard with a man carrying a gun in his right hand, whom the defendant identified at trial as Officer Hattenberger. Officer Hattenberger grabbed Michael Jones, who was closest to him; the man on the bicycle rode off, and the defendant started to back up. Then, according to the defendant, Officer Hattenberger "turned to me, point the gun at my chest and told me to run

so he could shoot me." The defendant said that Officer Hattenberger did not say "come here," and that he told Officer Hattenberger that he would not run, that he had no reason to run, and that Officer Hattenberger should put his gun away.

The defendant kept backing up, with his hands raised to shoulder height and the palms pointing outward. He backed up into Officer Brunkella, who grabbed and held onto the defendant. Defendant testified that Officer Hattenberger released Jones and turned to the defendant, squatted, "[a]nd he told me to run so he could shoot me." The defendant testified that he was stopped by Officer Brunkella from backing up farther.

Defendant testified that while Officer Brunkella held him, Officer Hattenberger ran up to them, and the three struggled, with the defendant positioned between the officers. Officer Brunkella told Officer Hattenberger to put his gun away as 'Hattenberger ran up to them. Officer Hattenberger "slapped" the defendant on his back, at which time the gun discharged and Officer Brunkella fell to the ground. Defendant testified that, as the gun discharged, Officer Hattenberger ducked behind the defendant, and when Officer Brunkella fell he threw his gun to the ground and pushed the defendant down, where they stayed until the other officers arrived. The defendant denied striking, struggling against, or pushing Officer Hattenberger.

### OTHER RELEVANT TESTIMONY

Officer Tom Cotter, Officer Brunkella's regular partner, testified about the plainclothes surveillance he and Officers Brunkella, Hattenberger, and Myamotto were engaged in on September 22, 1986. He testified that while he and Officer Myamotto were interrogating two men whose car they had stopped pursuant to a radio message from Officers Hattenberger and Brunkella, they received a radio message that an officer had been shot and they returned to the scene. They found Officer Brunkella lying on the ground with a chest wound, and Officer Hattenberger struggling with the defendant on the ground. Officer Cotter testified that he knew the defendant because he and Officer Brunkella had previously arrested the defendant for possession of marijuana, and that the defendant had not been armed at the time of the previous arrest.

Ricco Rodriguez, called as a prosecution witness, admitted that he was also known as Eric Charles and testified that he had been granted no deals or promises in return for his testimony. He testified that on September 22, 1986, he had been working in the 1600 block of West Jonquil Terrace and was returning from lunch when he saw the

defendant walking down the street. In response to the State's questions at trial, Rodriguez testified that he observed Jenkins approach the driver's side of a beige car, saw the driver hand Jenkins a bag of potato chips, and saw Jenkins walk away from the car eating the chips and then throw the bag away. The State then questioned the witness about his testimony before the grand jury on October 9, 1986, and in an effort to impeach him, repeated questions and answers where Rodriguez testified that Jenkins showed the driver three bags of "reefer" (marijuana), the driver handed two bags and $10 back to Jenkins, and Jenkins put the other two bags inside a potato chip bag under a tree near the school. The witness testified that he lied before the grand jury because one of the police officers investigating the case put a .357 gun to his head and told him this testimony was what the officer wanted Rodriguez to say or "he would blow my brain."

In a sidebar, the State informed the court it was taken by surprise by the witness' testimony and stated he had become a hostile witness. When testimony resumed, the witness testified that he and Jenkins knew each other and for a month in March 1987 they were both on the same tier in jail.

Rodriguez denied speaking with defense counsel prior to trial, although he admitted he had shouted that he was "Eric Charles" when the defense attorney visited the defendant in jail. That day the defendant was moved off the tier. On cross-examination, defense counsel elicited from the witness that neither the defendant nor his attorney had ever offered him money to change his story. Rodriguez testified that he was telling the truth at trial, although he had consciously lied before the grand jury to save his life.

Harry Walker lived near the site of the incident and was unloading fishing equipment from his van on September 22, 1986. He vaguely knew the defendant from the neighborhood but did not know him personally.

Walker was called as a witness by the State. He testified that he heard a commotion nearby and went to look. He saw three people falling in the street. He could not tell if any were holding on to the others or if any of them hit another. As they fell he heard a shot. When Walker looked again, the three people were on the ground. He did not recognize any of the people from a distance, but when he approached the group he recognized the defendant and recognized the others as policemen but did not know their names. Walker could not tell that Officer Brunkella was shot, but saw him move slightly. Officer Hattenberger was lying on top of the defendant; he told Walker not to come near and refused his offer of help.

Firearms expert Burt Nielson testified as an expert witness for the defense. He said that he had tested Officer Hattenberger's Colt .45 and found it to have a lighter than normal pull on the trigger. He noted that all the safety devices on the weapon were functioning. He also testified that in his 30 to 31 years with the Chicago police department, he had carried a Colt as his "secondary" weapon.

Detective Carey Orr was called as the State's rebuttal witness. He testified that after the shooting he interviewed the defendant regarding the incident. The interview took place in a conference room with at least five other persons present, including Detective Orr's commanding officer, the head of the Felony Review Unit of the Cook County State's Attorney's office, and persons from the Office of Professional Standards. He gave the defendant his *Miranda* warnings before the questioning began, after which the defendant indicated that he would speak with them.

Detective Orr testified that he asked the defendant the names of the persons in the car and on the street with whom the defendant spoke, but that the defendant could not give him the names of those on the street. The defendant told him that he had known at the time of the incident that Officers Brunkella and Hattenberger were police officers.

Later, Detective Orr again questioned the defendant with Assistant State's Attorney Kevin Moore present and taking notes. Detective Orr testified that during this interview, the defendant did not say that he had received the potato chips from two friends who drove up in a car.

Assistant State's Attorney Moore was called by the defense as a surrebuttal witness. He testified that on September 23, 1986, he was called to Area 6 and interviewed several persons, including the defendant. Assistant State's Attorney Moore was present when Detective Orr gave the defendant his *Miranda* warnings and questioned the defendant. According to the memorandum of the questioning prepared by Assistant State's Attorney Moore, the defendant testified "that he just received a bag of potato chips from 2 friends who drove up to him." The memorandum did not indicate that Detective Orr asked the names of these friends. On cross-examination, Assistant State's Attorney Moore testified that the defendant was asked the names but did not provide them.

Evidence regarding primary and secondary weapons is presented in summary as follows: Officer Cotter defined a "secondary duty weapon" as "[a] weapon other than your primary duty weapon the department issues you."

Officer Hattenberger testified that he had his primary duty weapon in a holster on the other side of his body from his secondary duty weapon. His primary duty weapon is a .38 with hollow-point bullets and was functional at the time of the incident. All officers must carry their primary duty weapon when on duty, but the secondary duty weapon is optional, and the officer must be authorized to carry the weapon. Both his secondary duty weapon and the ammunition for it were authorized. Officer Hattenberger testified that he had selected a Colt .45 as his secondary duty weapon because it has more "stopping power" than the .38.

Officer Hattenberger testified that he knew of official policy that "the use of firearms in any case is a last resort measure," and "that police officers may resort to the lawful use of firearms only after all other reasonable means at their disposal to effect apprehension and control of an individual have been attempted without success." Officer Hattenberger stated he knew that "use of deadly force by a police officer is only appropriate where the officer reasonably believes that such force is necessary to prevent the arrest from being defeated by resistance or escape; and the person to be arrested has committed or attempted a forcible felony or is attempting to escape by use of a deadly weapon or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay."

Officer Hattenberger also testified that while deadly force refers to the firing of a weapon, there is no directive detailing when the weapon may or should be drawn.

The Chicago police department issues hollow-point bullets to its officers. Burt Nielson testified that hollow-point bullets were chosen because they are less likely to ricochet or to pass through multiple victims.

OPINION

We first address the issue of whether the defendant's conviction was an unwarranted extension of the felony murder doctrine. The doctrine of felony murder holds a person responsible for deaths which occur as a direct and foreseeable result of a felony committed by that person. (*People v. Hickman* (1974), 59 Ill. 2d 89, 93-94, 319 N.E.2d 511, 513, *cert. denied* (1975), 421 U.S. 913, 43 L. Ed. 2d 779, 95 S. Ct. 1571.) The doctrine is a recognition that forcible felonies are "so inherently dangerous" that a resulting homicide, even an accidental one, is strongly probable. Ill. Ann. Stat., ch. 38, par. 9—1(a)(3), Committee Comments, at 19 (Smith-Hurd 1979).

"A person who kills an individual without lawful justifica-

tion commits murder if, in performing the acts which cause the death: *** He is attempting or committing a forcible felony other than voluntary manslaughter." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3).) The definition of forcible felony includes aggravated battery. (Ill. Rev. Stat. 1985, ch. 38, par. 2—8.) "A person who, in committing a battery *** [k]nows the individual harmed to be a peace officer, *** while such officer *** is engaged in the execution of any of his official duties including arrest or attempted arrest [commits aggravated battery] ***." (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(b)(6).) "A person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." Ill. Rev. Stat. 1985, ch. 38, par. 12—3(a).

■ In the instant case, the defendant knew that Officer Hattenberger was a police officer. Both the defendant and Officer Hattenberger testified that a struggle occurred. Officer Hattenberger testified that the defendant "gave me an elbow in the chest area," which he corroborated with photographs showing a bruise in his abdominal region. Bruises are considered proof that a battery occurred. *People v. Mays* (1982), 91 Ill. 2d 251, 256, 437 N.E.2d 633, 635-36.

Thus, the defendant committed a battery upon Officer Hattenberger, whom he knew to be a police officer engaged in the execution of an official duty at the time the battery occurred, which raises the battery to the level of aggravated battery, a forcible felony. At the time of the aggravated battery, the defendant knew that Officer Hattenberger had in his hand a cocked and loaded gun. Aggravated battery can be the predicating forcible felony under felony murder if Officer Brunkella's death was a foreseeable consequence thereof. It was clearly foreseeable that during a struggle the police officer's loaded and cocked weapon might discharge, causing a person to be injured and possibly killed. See *People v. McEwen* (1987), 157 Ill. App. 3d 222, 229, 510 N.E.2d 74, 79 ("it is apparent that defendant's shooting of [the victim] *** was felony murder even if the gun went off accidentally").

For these reasons, we hold that the charge of felony murder on the facts of this case was the appropriate charge against the defendant under section 9—1(a)(3) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)).

■ We next address defendant's challenges to the jury instructions. All instructions were tendered initially by the State. The defense tendered two replacement instructions which were accepted by the State and substituted in place of the State's proffered instruc-

tions. While it is the general rule that the defendant waives any error in jury instruction if he neither objects nor offers alternatives at the trial (*People v. Lowe* (1987), 152 Ill. App. 3d 508, 511, 504 N.E.2d 955, 957), substantial errors in jury instructions may be considered despite the failure to make timely objection when fundamental fairness so requires. *People v. Pegram* (1987), 152 Ill. App. 3d 656, 660, 504 N.E.2d 958, 963.

■ The defendant argues that the court erred in giving a non-IPI instruction for felony murder. Illinois Supreme Court Rule 451(a)(107 Ill. 2d R. 451(a)) mandates the giving of an IPI instruction whenever one exists. A non-IPI instruction should be given only if there is no IPI instruction which accurately and concisely states the applicable law. (*People v. Stamps* (1982), 108 Ill. App. 3d 280, 298-99, 438 N.E.2d 1282, 1297, *appeal denied* (1982), 91 Ill. 2d 564; *People v. Smith* (1982), 107 Ill. App. 3d 788, 791, 438 N.E.2d 501, 503; *People v. Dordies* (1978), 60 Ill. App. 3d 621, 626-27, 377 N.E.2d 245, 250.) We now consider whether the non-IPI instruction given by the trial court constitutes reversible error.

■ The IPI instruction, which accurately tracks the felony murder statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)), states in pertinent part that "[a] person commits the offense of murder when he kills an individual without lawful justification if, in performing the acts which cause the death, *** he ((is attempting to commit) (is committing)) the offense of [a forcible felony except voluntary manslaughter]." (IPI Criminal No. 7.01 (2d ed. 1981).) The instruction given here states that "[a] person commits the offense of murder when he commits a forcible felony and an individual is killed during the course of the commission of that forcible felony." The instruction given here does not require that the defendant commit the act, as does the IPI instruction, and the defendant argues that this is error.

The IPI instruction detailing the burden of proof for felony murder states in pertinent part that "[t]o sustain the charge of murder, the State must prove the following propositions: First: That the defendant performed the acts which caused the death of [the victim]; and Second: That when the defendant did so, he ((was attempting to commit)(was committing)) the offense of [a forcible felony other than voluntary manslaughter]." (IPI Criminal 2d No. 7.02.) The given instruction required the State to prove that "the defendant committed the offense of aggravated battery; and *** [t]hat Officer Jay Brunkella was killed during the course of the commission of that offense." The given instruction does not require the defendant to have committed the act of firing the gun.

The cases previously decided in this jurisdiction reflect no requirement that the defendant be both the person who commits the felony and the person who performs the act which causes the victim's death. A defendant has been held responsible for the death of a cofelon as they escaped after committing a felony (*People v. Graham* (1985), 132 Ill. App. 3d 673, 681, 477 N.E.2d 1342, 1348 (armed robbery)) or of a police officer killed by another police officer as they pursued and attempted to apprehend the felon after the commission of a forcible felony. (*People v. Hickman* (1974), 59 Ill. 2d 89, 94, 319 N.E.2d 511, 513 (burglary); *People v. Allen* (1974), 56 Ill. 2d 536, 545, 309 N.E.2d 544, 548-49 (robbery).) A defendant has been held responsible for the death of a victim who jumped from a window to escape the defendant. *People v. Smith* (1974), 56 Ill. 2d 328, 333-34, 307 N.E.2d 353, 355-56; *People v. Davis* (1988), 173 Ill. App. 3d 300, 310, 527 N.E.2d 552, 559.

Here, the given instruction defining felony murder stated that the victim must be found to have been killed "during the course of" the forcible felony. The defendant argues that the only felony occurred when the defendant elbowed Officer Hattenberger, and because this admittedly did not cause the gun to discharge, the defendant cannot be held responsible for Officer Brunkella's death. The record discloses a struggle took place between the defendant and Officer Hattenberger, during which the defendant elbowed the officer, the officer raised his right arm to hold the defendant, and that in the struggle they fell to the ground, causing Officer Hattenberger's gun to discharge. It is foreseeable that during a struggle with a person holding a loaded and cocked gun, the weapon could discharge and strike any person at the scene. From the record it is clear that Officer Brunkella's death was a foreseeable result of the defendant's struggle with Officer Hattenberger.

IPI Criminal 2d No. 7.01 requires the defendant to have committed both the forcible felony and the act directly causing the victim's death. A trial court may give a non-IPI instruction where the available IPI instruction "does not accurately state the law." (107 Ill. 2d R. 451(a).) The given instruction stated the law applicable to the facts of this case more accurately than the IPI instruction. (*People v. Matthews* (1984), 126 Ill. App. 3d 710, 713-14, 467 N.E.2d 996, 1000.) We find that the trial court committed no error in giving the non-IPI felony murder instruction in this case.

■ The defendant next argues that it was error to instruct the jury regarding the "physical contact of an insulting or provoking nature" basis for battery when this was not charged in the indict-

ment. The State argues that the defendant cannot complain of a jury instruction which he submitted. The record reflects that the defense attorney approved the State's instruction for battery. After discussion, it was agreed that the instruction for aggravated battery was not sufficiently clear, and the substituted instruction submitted by the defense which included the elements of bodily harm and physical contact to sustain the charge of aggravated battery was given to the jury.

Generally, the State must choose which ground to charge for battery, or must charge in the alternative. (*People v. Veile* (1982), 109 Ill. App. 3d 847, 850, 441 N.E.2d 149, 151.) Here, the State charged bodily harm. Visible injury is not required to prove bodily harm (*People v. Foster* (1982), 103 Ill. App. 3d 372, 377, 431 N.E.2d 430, 435), and bruises are considered sufficient evidence of bodily harm. *People v. Mays* (1982), 91 Ill. 2d 251, 256, 437 N.E.2d 633, 635-36.

Where the indictment states the offense, specifies the defendant's conduct, and cites the statute, it is deemed sufficient to inform the accused of the nature of the offense against him. (*People v. Laramore* (1987), 163 Ill. App. 3d 783, 789, 516 N.E.2d 401, 407; *People v. McEvoy* (1975), 33 Ill. App. 3d 409, 412, 337 N.E.2d 437, 440.) On appeal, a defendant may not complain of deficiencies in an instruction tendered by the defense. *People v. Gallardo* (1983), 112 Ill. App. 3d 764, 773, 445 N.E.2d 1213, 1220, *appeal denied* (1983), 94 Ill. 2d 554.

■ The defendant next argues that error occurred when the trial court instructed the jury that the grand jury testimony of Ricco Rodriguez could be considered as substantive evidence and was not limited to impeachment of his trial testimony. The defense argued that this instruction was inappropriate because of the State's failure to complete or perfect the impeachment of the witness based on his grand jury testimony. The State offered the instruction to show Rodriguez's testimony at trial was inconsistent with his testimony before the grand jury. The court noted that under the Code of Criminal Procedure of 1963 the information is admissible for that purpose. Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1.

Although an IPI instruction exists as to the admissibility of a prior inconsistent statement for impeachment purposes (IPI Criminal 2d No. 3.11), there is no IPI instruction regarding the admissibility of a witness' prior inconsistent statement as substantive evidence. Where no appropriate IPI instruction exists, the trial court may give a non-IPI instruction. (*People v. Stamps* (1982), 108 Ill. App. 3d 280, 298, 438 N.E.2d 1282, 1297, *appeal denied* (1982), 91 Ill. 2d 564.) In a case with facts similar to ours, the court held that the giving of a similar non-IPI instruction is appropriate. (*People v. Atkins* (1987), 161

Ill. App. 3d 600, 612, 515 N.E.2d 272, 279, *appeal denied* (1988), 118 Ill. 2d 546, 520 N.E.2d 388.) We find no error in the trial court's instruction.

■■ The defendant next argues that certain erroneous evidentiary rulings by the trial court deprived him of a fair trial. First the defendant argues that there was error in admitting hearsay testimony that he carried a gun. Officer Hattenberger testified that he drew his gun and loaded it because he had heard on the street that the defendant carried a gun, but could not identify from whom he had heard the statement. The defense argues that the testimony was hearsay and therefore was inadmissible. The defense counsel objected at trial, and the judge instructed the jury that the information was "not accepted for truth of it, only that that is what he had heard."

The United States Supreme Court has held that "[t]he hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements." *Dutton v. Evans* (1970), 400 U.S. 74, 88, 27 L. Ed. 2d 213, 226, 91 S. Ct. 210, 219.

Statements which are offered to show why the witness acted in a certain way are not considered hearsay and are therefore admissible into evidence. (*People v. Sanders* (1988), 168 Ill. App. 3d 295, 309, 522 N.E.2d 715, 726.) Because Officer Hattenberger was explaining why he drew and loaded his weapon even though the defendant did not display a weapon at any time, his testimony is admissible and is not hearsay. The court's admonition to the jury as to the limits of the statement's admission corrected any alleged error.

■■ The defendant argues that the trial court erred in refusing testimony offered by the defense that a civil lawsuit was filed by Officer Brunkella's widow against the City of Chicago and the Chicago police department. While great latitude should be granted when cross-examining witnesses regarding possible bias or motive to testify falsely (*People v. Smith* (1988), 172 Ill. App. 3d 94, 108-09, 526 N.E.2d 849, 858), this is at the discretion of the trial court and should not be permitted if too remote or uncertain. *People v. Testa* (1984), 125 Ill. App. 3d 1039, 1046, 466 N.E.2d 1126, 1132.

When impeaching witnesses, defendants may not raise the fact of a civil suit filed by the defendant against the witness (*People v. Jarosiewicz* (1977), 55 Ill. App. 3d 1057, 1062, 371 N.E.2d 949, 953-54), but may raise the fact of a suit filed by the witness against the defendant. *People v. Crosser* (1983), 117 Ill. App. 3d 24, 29-30, 452 N.E.2d 857, 862.

■■ In our case, the widow's suit was filed only a few days be-

fore the trial began. The defendants are the City of Chicago and the Chicago police department, which are charged with failing to adequately train personnel in, and to properly supervise and monitor, the use of the Colt .45, and with failing to monitor or prevent the use of the hollow-point bullets which the Chicago police department issued. Hattenberger is not named as a defendant in the civil suit. The complaint, however, alleged "[t]hat at all times relevant hereto, decedent's partner was acting within the scope of his employment and under the color of law."

Because the suit had no probative value in determining the defendant's guilt or innocence, the trial court properly admonished the jury that references to and interrogation about the widow's civil suit were not admissible and instructed them not to consider it in their deliberations. We need not address the State's motion to strike the copy of this lawsuit which was attached to the defendant's reply brief.

■■ The defendant next argued that the trial court erred when it denied the defense's motion *in limine* to permit questioning about a 1975 incident in which Officer Hattenberger accidentally shot another officer after being jostled. The trial court denied the defense motion, finding the incident not relevant to the case on trial. The trial court's denial of the defendant's motion *in limine* was not error.

The defendant next argues that the trial court erred in its denial of defense's post-trial motion for a new trial because of new information about Officer Hattenberger not known to the defense until after the trial ended. Officer James Crooks disclosed information about an incident in which Officer Hattenberger allegedly hit a suspect on the back of the head with a flashlight. No complaint was made concerning this incident, nor was there any internal investigation. Defense counsel argued that as newly discovered information which could not be found with due diligence before the end of trial, the information required that a new trial be granted so that the jury could consider this information in its assessment of Officer Hattenberger's credibility. The trial court permitted Officer Crooks to testify at the hearing on the defendant's motion for a new trial regarding the new information. After consideration of the evidence, and a review of the applicable law, the trial court denied the defendant's motion for a new trial.

■■ The decision of a trial court to deny the defendant's motion for a new trial should not be disturbed by a reviewing court unless it exhibits a manifest abuse of discretion. (*People v. Reese* (1973), 54 Ill. 2d 51, 59, 294 N.E.2d 288, 291.) To justify granting a new trial, the newly discovered evidence must be material and likely to change the

result if it had been available to the jury at the time of trial. (*People v. Chew* (1987), 160 Ill. App. 3d 1082, 1085-86, 513 N.E.2d 1099, 1101.) "Newly discovered evidence, the effect of which is to discredit, contradict and impeach a witness, does not afford a basis for the granting of a new trial." *People v. Holtzman* (1953), 1 Ill. 2d 562, 568, 116 N.E.2d 338, 341.

■■ Defendant's trial counsel admitted that the testimony of Officer Crooks would only discredit Officer Hattenberger's reputation and is not sufficient reason to grant the post-trial motion. The trial court properly denied the defense's motion for a new trial.

We next address the defense argument that because of certain alleged prosecutorial misconduct, defendant should be granted a new trial. The first instance of such misconduct alleged is the State's accusation that the defendant had attempted to bribe Ricco Rodriguez to change his testimony.

After Rodriguez testified that he lied to the grand jury because a police "officer had told me that if I wouldn't do it, he would blow my brain," and after Rodriguez contradicted most of the testimony he had given to the grand jury, he was asked whether he recalled telling the assistant State's Attorneys that the defendant "was trying to get you to take money to change your testimony[.]" Rodriguez denied making the statement and on cross-examination testified that he had never spoken with the defense attorney. Rodriguez testified that several months before the trial began he and the defendant had been on the same jail tier for one month and that since then they have been in different tiers and do not see each other.

The only evidence that Rodriguez had been threatened was his own testimony. The State offered no evidence that he had been offered a bribe to change his testimony from what he had told the grand jury. On cross-examination the defense attorney raised the question of whether he or the defendant had offered the witness money to change his testimony at trial, and the witness answered no. In rebuttal closing argument, the State commented on Rodriguez's testimony and the motivation he could have had for changing his testimony at trial from the testimony given before the grand jury. During this portion of rebuttal closing argument, the defense made four objections, all of which were sustained. The colloquy is set forth in full:

"[State's Attorney]:
***

He's a lot more than just a liar. But he's got an awful lot in common with Allison Jenkins. They both spent a month to-

gether in the same tier. They both know each other from the street, which is kind of interesting, because Ricco is not out on the street very much. Same division. They are both currently serving time. They both have pending cases. Wouldn't be surprised if Allison Jenkins happened to wind up as an ailibi witness on Ricco's pending—

[Defense Attorney]: Objection.

THE COURT: Objection sustained. There's no evidence whatsoever of that.

[State's Attorney]: The defendant did tell you just an—just an incredible statement on the witness stand. We don't talk about cases in the jail. That's all they think about back there.

[Defense Attorney]: Objection.

THE COURT: Objection will be sustained. Improper comment.

[State's Attorney]: Well, do you think, ladies and gentlemen, these guys never talk about what—do you think that statement he made is true? Do you think these guys don't—don't think about ways—how they're going to get out on the street, how they are going to beat their cases. Is that reasonable? Wouldn't talk to Ricco about it. Of course. Ricco with this big secret that he claims he's been maintaining.

You mean to tell me in a quiet moment, the two of them alone, Ricco never said hey, don't worry. When I get to court, you're going to be eating potato chips. No, no, no. He wouldn't say that. He wouldn't say that to this poor, innocent man in the jail. Wouldn't tell him to give him a little comfort. No, no. We have never got together. Never talked about it. Boy, was I surprised. Boy, was I nervous. When Ricco Rodriguez got to the stand. He was really worried. I'll bet.

[Defense Attorney]: Objection.

THE COURT: Objection will be sustained.

[State's Attorney]: And don't ever forget Ricco Rodriguez's face, his demeanor. The way he testified on that witness stand. The way he looked around this courtroom. What was going through his head. You knew what was happening. Mr. Deceit. He's going to help out his buddy by design. Committed perjury to you without any hesitation, without any problem at all. Not surprising based on the kind of thing he normally does.

You can really see in his face how clever he thought he was. That look on his face. I wish I could describe it. I wish I could really describe it, but you all saw it. Send Ricco a message that

this charade won't work.

[Defense Attorney]: Objection.

THE COURT: Objection will be sustained. Jury will disregard that."

 Where the defendant's guilt is a close question, and depends primarily upon the credibility afforded him and the witnesses who testify on his behalf, and the prosecution raises a number of unsupported insinuations which may have affected the jury's decision, fundamental fairness demands that the defendant be granted a new trial. *People v. Nuccio* (1969), 43 Ill. 2d 375, 396, 253 N.E.2d 353, 364; *People v. Holman* (1984), 103 Ill. 2d 133, 164, 469 N.E.2d 119, 134.

Even where objections are made and sustained, if the comments are sufficiently egregious and unsupported by any evidence the defendant should be granted a new trial. (*People v. Ray* (1984), 126 Ill. App. 3d 656, 662-63, 467 N.E.2d 1078, 1084; *People v. McCray* (1978), 60 Ill. App. 3d 487, 490, 377 N.E.2d 46, 48.) In this case, there was no evidence of any agreement between the defendant and Rodriguez, no evidence that Rodriguez had been bribed to change his testimony, and nothing to support the suggestion made for the first time in rebuttal closing argument that the defendant might appear for Rodriguez in another case. Here, the trial court promptly sustained the defense's objections to those statements and directed the jury to ignore them. The court's admonition to the jury was sufficient to cure any perceived prejudice to the defendant, and we find no error.

 The defendant next argues that the prosecution's improper appeal to the passions of the jury during closing arguments negated the defendant's chance for a fair trial. Attorneys are granted great latitude in making closing remarks, and even remarks which may be inflammatory do not justify granting the defendant a new trial unless the remarks are so inappropriate that they lead to substantial prejudice against the accused (*People v. Baptist* (1979), 76 Ill. 2d 19, 29, 389 N.E.2d 1200, 1205) and a different trial would have resulted had they not been made. (*People v. Jackson* (1981), 84 Ill. 2d 350, 360, 418 N.E.2d 739, 744.) "A prosecutor may properly *** speak of the evil results of crime and the benefits of a fearless administration of the law." *Jackson*, 84 Ill. 2d at 360, 418 N.E.2d at 744; see also *People v. Lewis* (1979), 75 Ill. App. 3d 259, 288, 393 N.E.2d 1098, 1120 ("the prosecutor is permitted to comment upon the evil results of a crime and its effect upon the community").

The question here is whether the prosecution's closing statements

exceeded these boundaries and served solely to inflame the passions or fears of the jury. (*People v. Terry* (1984), 99 Ill. 2d 508, 517, 460 N.E.2d 746, 750; *People v. Anderson* (1981), 95 Ill. App. 3d 492, 496, 420 N.E.2d 830, 833.) This is to be determined from the totality of the circumstances surrounding the comments, including the language used and its relationship to the evidence in the case. *People v. Witted* (1979), 79 Ill. App. 3d 156, 165, 398 N.E.2d 68, 76.

In rebuttal closing argument, the State argued:

"Ricco [Rodriguez] and Allison Jenkins have no regard for our laws. \*\*\* Have no regard for the truth. \*\*\* They have no regard for you. They have no regard for our system of justice. They have no regard for our elementary schools. They also have no regard for our police officers.

\*\*\*

You know, there's a marvelous little motto on the side of police cars. I'm sure you've all heard it. 'We serve and protect.' The law in this case demands that we do something about that motto. Jay Brunkella, decorated eighteen year veteran. You will get this in the jury room. Decorated eighteen year veteran spent eighteen years of his life serving and protecting.

You got your jury summons in the mail. You came down here and you served. All that's left for you to do now is what Jay Brunkella did his whole life. Protect our schools, protect our streets, protect our neighborhoods and protect our policemen. Follow the law and your oath, ladies and gentlemen."

A statement in closing argument that the jurors "are here to protect the life and limb of every citizen" has been held not prejudicial. (*People v. Bailey* (1966), 76 Ill. App. 2d 310, 321, 222 N.E.2d 268, 273.) Because there is concern that such comments may "exceed the boundaries of fairness and impartiality inherent in our system of adversary justice," courts are looking more carefully at objectionable language. *People v. Brown* (1983), 113 Ill. App. 3d 625, 629, 447 N.E.2d 1011, 1014.

The defense argues that statements very similar to those in the prosecution's closing argument were discussed in *People v. Threadgill* (1988), 166 Ill. App. 3d 643, 520 N.E.2d 86. There the prosecuting attorney told the jury that police officers "are out there trying to protect you and your family. They are putting their lives on the line for you. \*\*\* Now you can either follow up on that and back them up or you can turn your back on them," and that "if you don't think what you do today is going to send a message to the [defendant]s of

the world and your police officers, you're wrong. Because you can either back them up when they're out there at night risking their lives for you and your family or you can turn your back on them." (*Threadgill*, 166 Ill. App. 3d at 648-50, 520 N.E.2d at 89-90.) The defendant had been charged only with residential burglary and theft, and the court found the statements were sufficiently inflammatory and unrelated to the evidence presented that justice was denied and a new trial required. The facts in *Threadgill* are distinguishable from those in our case, and we find that the errors in the closing argument of the prosecution there have no parallel to our case.

In rebuttal closing argument, the State talked about Rodriguez's testimony at trial and his grand jury testimony and the reason given by the witness for the contradictions between the two interrogations. The comparisons made by the State between Officer Brunkella and the defendant and Rodriguez was appropriate closing argument and proper commentary on the law and on the administration of justice. The State's argument was not inflammatory and we find no error.

We next address the issue of whether the State met its burden of proving the causation, intent, and bodily harm elements of aggravated battery and felony murder.

 Felony murder requires proof that the defendant was attempting or committing a forcible felony and that there was a killing as a direct result of that felony. (*People v. Brown* (1979), 70 Ill. App. 3d 922, 925-26, 388 N.E.2d 1253, 1256.) In felony murder, the underlying forcible felony substitutes for the intent to commit murder. (*People v. Miller* (1980), 89 Ill. App. 3d 973, 979, 412 N.E.2d 175, 180, *cert. denied* (1981), 454 U.S. 871, 70 L. Ed. 2d 175, 102 S. Ct. 339.) The underlying forcible felony in the instant case is the aggravated battery committed upon one known to the defendant to be a police officer engaged in the execution of his duty at the time of the occurrence. (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(b)(6).) The defendant indicated that he knew or inferred that Officer Hattenberger was a police officer. The question then is whether he committed a battery on Officer Hattenberger. Unless each element of battery can be shown beyond a reasonable doubt, the conviction for felony murder here cannot be sustained. *People v. Pecina* (1985), 132 Ill. App. 3d 948, 955, 477 N.E.2d 811, 816.

 A battery occurs when a person "intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." (Ill. Rev. Stat. 1985, ch. 38, par. 12—3(a)(1).) The two issues to be addressed are whether the defend-

ant caused bodily harm to or made physical contact with Officer Hattenberger, and whether in so doing the defendant acted intentionally or knowingly.

■■■ Bodily harm may be shown by actual injury, such as bruises, (*People v. Mays* (1982), 91 Ill. 2d 251, 256, 437 N.E.2d 633, 635-36) or may be inferred by the trier of fact based upon its common knowledge. (*People v. Rotuno* (1987), 156 Ill. App. 3d 989, 993, 510 N.E.2d 463, 465.) Although the defendant testified that there was little or no struggle, Officer Hattenberger testified that the defendant "gave me an elbow in the chest area," which he supported with pictures of a bruise in his abdominal region, taken two days after the incident. The officer admitted that it was possible the bruise occurred when they fell. While the act of resisting a police officer can occur when the defendant pulls or runs away, battery requires that the defendant make actual physical contact with or cause harm to the police officer. (*City of Chicago v. Brown* (1978), 61 Ill. App. 3d 266, 277, 377 N.E.2d 1031, 1039.) Here this is not in dispute; the defendant admits that actual physical contact occurred, and the officer gave evidence of actual bodily harm.

The next question to be addressed is whether the defendant acted intentionally or knowingly. Where the defendant does not admit to the commission of the act, intent may be inferred from the surrounding circumstances. *People v. Koshiol* (1970), 45 Ill. 2d 573, 578, 262 N.E.2d 446, 449, *cert. denied* (1971), 401 U.S. 978, 28 L. Ed. 2d 329, 91 S. Ct. 1209; *People v. Neeley* (1979), 79 Ill. App. 3d 528, 529, 398 N.E.2d 988, 990.

The defendant testified that Officer Brunkella stopped him from backing up when faced with Officer Hattenberger's gun and Officer Hattenberger then grabbed him and "slapped" the defendant on the back, causing his gun to discharge. The defendant said that he did not strike, struggle against, or push Officer Hattenberger. Witness Harry Walker testified that he saw three people falling and could not see any one hit another. Officer Hattenberger testified that after he grabbed the defendant, the defendant elbowed him. Officer Hattenberger tried to hold onto the defendant by pulling the defendant close and wrapping his arm around the defendant, and together they fell.

When witnesses offer contradictory evidence, it is for the trier of fact to judge the credibility of witnesses and decide the weight to be given the testimony of each. (*People v. Titone* (1986), 115 Ill. 2d 413, 422, 505 N.E.2d 300, 303.) Unless the decision appears unreasonable based upon the evidence, it will not be overturned by a reviewing

court. *People v. Brisbon* (1985), 106 Ill. 2d 342, 360, 478 N.E.2d 402, 410; *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1320.

The evidence supports a finding that there was a physical contact resulting in bodily harm to Officer Hattenberger during the defendant's struggle with the police officer as required for aggravated battery. The aggravated battery is the forcible felony which substitutes for intent as required for felony murder. We will not disturb the jury's determination of the credibility of these witnesses, nor will we disturb the finding that the defendant was proven to be the person who caused the chain of events which resulted in Officer Brunkella's death.

The defendant next argues that he should be granted a new trial because he was denied effective assistance of counsel. Although issues not argued in a post-trial motion are deemed waived for review (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1123, 1129), allegations of ineffective assistance of counsel are not the type of issue which one would expect to find in a post-trial motion (*People v. Friesland* (1985), 109 Ill. 2d 369, 375, 488 N.E.2d 261, 263; *People v. Pendleton* (1977), 52 Ill. App. 3d 241, 245, 367 N.E.2d 196, 199) and so may be reviewed.

To determine whether counsel's representation was ineffective, one must examine first whether the attorney's performance was deficient under general standards of professionalism, and if so, whether counsel's representation was so deficient that the defendant was harmed thereby. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) In so doing, the reviewing court must be deferential and not attempt to judge the performance of trial counsel unfairly; this should be done in light of the case at the time of trial and not with the benefit or detriment of hindsight. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

The defendant first argues that defense counsel prejudiced defendant's case in failing to object to State's submission of non-IPI instructions for the elements of felony murder. Illinois Supreme Court Rule 451(a) mandates the giving of an IPI instruction if one exists. (107 Ill. 2d R. 451(a); *People v. Stamps* (1982), 108 Ill. App. 3d 280, 298-99, 438 N.E.2d 1282, 1297, *appeal denied* (1982), 91 Ill. 2d 564.) Generally, failure to object to an instruction precludes objecting to that instruction at a later time. *People v. Smith* (1978), 71 Ill. 2d 95, 104, 374 N.E.2d 472, 475.

On appeal defendant argues that his trial counsel erred in not ob-

jecting to the non-IPI instructions which were offered for the definition and elements of felony murder. We find that although they were non-IPI instructions, the felony murder instructions given by the trial court were appropriate. Defense counsel's failure to object to an instruction which correctly states the law and the State's burden of proof was not ineffective assistance of counsel.

■■■ Defendant's appellate counsel argues that defense counsel made a second error in submitting jointly with the State a jury instruction on the elements of aggravated battery which included physical contact of an insulting or provoking nature, an element of battery with which the defendant was not charged. The joint instruction included the alternative elements of "bodily harm" or "physical contact of an insulting or provoking nature." The State offered proof to establish "bodily harm" to Officer Hattenberger. While the inclusion of the "physical contact" alternative element in the absence of any such charge in the indictment may be error, we find it to be harmless error. Defense counsel's submission of this instruction did not result in defendant's conviction since the evidence clearly supports the jury's verdict. On this question defense representation was not so deficient as to require a new trial.

■■■ Defendant next argues that his trial counsel failed to protect his *Batson* rights when he failed to object to the court permitting the court reporter to leave during *voir dire*. He argues that he was irreparably harmed when the State dismissed potential jurors of the defendant's race from the venire, in violation of the United States Supreme Court's decision in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Preservation of the record, including *voir dire*, is the responsibility of the defense, and without the *voir dire* the defendant's challenge to the jury cannot be supported (*People v. Brown* (1987), 152 Ill. App. 3d 996, 1002, 505 N.E.2d 397, 401), but mere failure to preserve the *voir dire* interrogation is not in and of itself indicative of ineffectiveness of counsel. *People v. Thompkins* (1988), 121 Ill. 2d 401, 448, 521 N.E. 2d 38, 59.

The record discloses that defense counsel moved for a mistrial immediately following jury selection, based on the fact that of the 10 blacks in the venire, nine were stricken and only one actually sat on the jury. Of the nine, five were stricken by the court for cause and four by the prosecution.

On the record, the court stated that five black prospective jurors were excluded for cause. On the record, defense counsel stated that he was only asking for a mistrial based upon what he saw as the prosecution's systematic exclusion of blacks.

Following this dialogue, the court asked the prosecuting attorney to state *on the record* why he had dismissed each of the prospective jurors. Although the court stated that it was "not asking for a Batson hearing," the prosecution noted for the record that of the six jurors it dismissed, two were nonblacks. Of the remaining State exclusions, the first was a woman who lived in a high-crime area and "dressed completely and totally inappropriate for coming to Court," upon which the trial court also commented. The prosecuting attorney also noted "the manner in which she answered questions, and what I would characterize as a cavalier attitude," which "had nothing to do with whether or not she was black or white."

The next black potential juror who was dismissed was a man "who indicated at one point that he had previously been falsely accused," which the trial court found sufficient for dismissal. In addition, "[h]e was an extremely youthful individual," and "he was sleeping during questioning of the members of the venire." Combined with the facts that he was single and a renter, the prosecution stated these were sufficient reasons to dismiss him, "irrespective of whether he was black or white."

The third black prospective juror who was dismissed was "a very young male" who "had just recently started working," which the trial court found "a valid reason in itself for the exclusion." He made a poor physical impression. The fourth prospective black juror who was dismissed was an "extremely youthful" woman who had been at her current job for just two months, rented, and "based on her demeanor in Court and the manner in which she answered questions," the State found her to be inappropriate for the jury on a case of this type. The trial court agreed.

The defense argued that the only reason the excluded jurors were dismissed is that "they were black and not appropriately attired." The trial court found that the reasons given were sufficient to support the exclusion of these potential jurors.

In a similar case, the Illinois Supreme Court recently held that although all the excluded jurors for whom the defendant retained a claim of *Batson* violation were black, they shared sufficient other characteristics which would warrant their exclusion from the jury that their dismissal could not be found to violate *Batson*. (*People v. Evans* (1988), 125 Ill. 2d 50, 65, 530 N.E.2d 1360, 1366.) Here valid reasons were given for the exclusion of each potential juror, preserved on the record despite the fact that the *voir dire* was not. We find the failure of defendant's trial counsel to preserve the *voir dire* is not ineffective representation and that sufficient record of defense

142

objections was made.

■■ The defendant next argues that defense counsel failed to request a substitution of judge, and that he should have done so. A few months before trial began in the instant case, the defendant appeared before Judge Urso on a charge of delivery of a controlled substance (cocaine) and was found guilty by a jury and sentenced to six year's incarceration. In imposing sentence, the judge stated that he did "not believe that the maximum sentence for incarceration is appropriate in this case" but he did make strong comments against the crime and the defendant's engaging in the delivery of drugs.

Defendant argues that failure of defense counsel to move for a substitution of judge in place of Judge Urso was ineffective representation of counsel, citing *People v. Chatman* (1967), 36 Ill. 2d 305, 223 N.E.2d 110. However, *Chatman* is totally inapposite to the instant case. There, the defendant had a bench trial, and the judge commented pejoratively during trial that he did not believe the defense. (*Chatman*, 36 Ill. 2d at 307, 223 N.E.2d at 111.) The record in the instant case reflects precisely the opposite. Judge Urso considered all of the defendant's motions and objections, and gave detailed reasons for each of his decisions. Additionally, when imposing sentence in the instant case the judge reviewed substantial material and entertained argument from both the prosecution and defense counsel before imposing sentence. He noted on the record that 20 years "is clearly the minimum time allowed by the law," that "it is also the minimum sentence for the offense of murder."

Because nothing on the record supports defendant's contention that the trial counsel should have requested a substitution of judge, failure to do so cannot be the basis for a finding of ineffective assistance of counsel.

■■ Another argument raised by the defendant to support his claim of ineffective assistance of counsel is the defense counsel's failure to object to the prosecution's allegation that defendant attempted to bribe Ricco Rodriguez to change his testimony. When Ricco Rodriguez testified differently from his testimony before the grand jury, the prosecuting attorney first attempted to use Rodriguez's grand jury testimony to impeach his trial testimony. After Rodriguez testified that he perjured himself before the grand jury because he was threatened, the prosecuting attorney asked whether Rodriguez had ever told him "that Allison Jenkins was trying to get you to take money to change your testimony," which Rodriguez denied. Defense counsel objected, but the trial court overruled the objection and allowed the answer to stand. On cross-examination, the defense coun-

sel asked Rodriguez whether either the defendant or defense counsel had ever given Rodriguez money, to which Rodriguez answered no. The issue was not raised again until the prosecution's rebuttal closing argument.

Defendant's trial counsel was not required to demand that the prosecution make any proof of its allegation. He made timely objections to rebuttal closing arguments which were sustained by the court and the jury was told to disregard the argument. There is no support for the argument that defense counsel's decision not to demand proof was error, and therefore, we do not find that it constitutes ineffective representation.

■ We next address defendant's argument that he should be granted a new trial because the trial court failed to give a proper deadlocked jury instruction. The defendant argues that when the jury sent a message to the trial court stating that it was deadlocked on the issue of whether the defendant was guilty of felony murder, the court should have given an instruction similar to the instruction in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731, and by not giving such instruction the court committed reversible error. Defense bases its argument on the fact that one juror approached the court the week after the trial concluded and stated that she had not wanted to join the verdict but had felt pressured to do so and was afraid to speak up when the jury was polled. Jurors cannot recant or impeach their verdict after it is given and the jury has been dismissed. *People v. Nuccio* (1973), 54 Ill. 2d 39, 49, 294 N.E.2d 276, 281.

In *Prim*, the Illinois Supreme Court stated that instructions given to a deadlocked jury should be neutral and not coercive. (*Prim*, 53 Ill. 2d at 76, 289 N.E.2d at 610.) No juror should feel pressure to "surrender his honest conviction as to the weight or effect of the evidence" for the sake of a verdict. *Prim*, 53 Ill. 2d at 75, 289 N.E.2d at 609.

The test for an improper instruction is whether it may have hastened the verdict, coerced a juror into making a decision which she did not feel was correct, or otherwise interfered with the deliberations such that the defendant was prejudiced. (*People v. Palmer* (1984), 125 Ill. App. 3d 703, 713, 466 N.E.2d 640, 648.) Unless the trial record clearly shows that a juror indicates she was coerced or otherwise improperly influenced in her decision, there is no ground for reversal of the decision. *People v. Cabrera* (1985), 134 Ill. App. 3d 526, 530, 480 N.E.2d 1170, 1173-74.

The record in the instant case indicates merely that when the jury indicated that it was deadlocked and requested guidance, the trial judge "instructed the jury *** to continue deliberating," and that the jury reached a verdict approximately three hours later. When the jury was polled, all 12 jurors answered that it "was then and is now" their verdict, and there is no indication in the trial record that this was not true. The mere directive to continue deliberating is sufficiently simple and neutral that it cannot be considered coercive. (*People v. Farella* (1979), 79 Ill. App. 3d 440, 446, 398 N.E.2d 615, 619.) Because there is no indication that any other instruction was given to the deadlocked jury, there is no basis for reversal.

■ Finally, the defendant argues that the 20-year sentence imposed for the felony murder conviction is unconstitutional. When Judge Urso imposed sentence, he noted on the record that 20 years is the minimum term permitted for murder by the Unified Code of Corrections. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1).) A statutory minimum sentence for murder has been held constitutional. (*People v. Koeppen* (1974), 21 Ill. App. 3d 478, 482, 315 N.E.2d 679, 682 (14 years at the time of that case).) A sentence of 100 to 200 years was upheld when a defendant with no serious prior criminal history was found guilty of the murder of a police officer who was engaged in the execution of his duty when he was killed. *People v. Tiller* (1978), 61 Ill. App. 3d 785, 797, 378 N.E.2d 282, 292.

We hold that the sentence imposed by the trial court does not violate the constitutional guarantees of the eighth amendment of the United States Constitution, nor of article I, section 11, of the Illinois State Constitution.

For all of the foregoing reasons, the judgment of the trial court is affirmed.

Judgment affirmed.

EGAN, P.J., and McNAMARA, J., concur.